**STATE of Minnesota, Respondent,**

v.

**Cashim ALLADIN, Appellant.**

No. C8–86–1734.

Court of Appeals of Minnesota.

June 23, 1987.

Review Denied Aug. 12, 1987.

Hubert H. Humphrey, III, Atty. Gen., Robert A. Stanich, Spec. Asst. Atty. Gen., St. Paul, for respondent.

C. Paul Jones, State Public Defender, Marie L. Wolf, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by LANSING, P.J., and HUSPENI, and RANDALL, JJ.

## OPINION

RANDALL, Judge.

A jury convicted appellant Cashim Alladin of attempted murder in the second degree, Minn.Stat. §§ 609.19 (1984) and 609.-17 (1984); assault in the first degree, Minn. Stat. § 609.221 (1984); and kidnapping, Minn.Stat. § 609.25, subd. 1(1) (1984). Appellant was sentenced to the presumptive sentence of 62 months for attempted second degree murder and to a consecutive 21-month term, execution stayed, with up to ten years probation for the kidnapping. We affirm.

## FACTS

Appellant and Diana Alladin were married in 1968. They have four children: Omar, age 17; Chad, age 11; Andre, age 8; and Desiree, age 5.

Diana first discussed a dissolution with appellant in 1984. Appellant told Diana that he would kill her before he would let her out of their marriage. In 1985, Diana commenced a dissolution action and had a protection order drawn up, but she dropped the proceedings when appellant assured her that things would be different.

In April 1986, Diana commenced another dissolution action. On April 4, the trial court issued an order pursuant to Minn. Stat. § 518.131 (1984) which: (1) granted Diana temporary primary physical and legal custody and control of the children; (2) granted Diana temporary and exclusive occupancy of the homestead; (3) restrained appellant from annoying or harming Diana or the children; and (4) restrained appellant from entering the homestead at any time.

On April 5, 1986, the order was served on appellant while he was at the Alladin home. Appellant gathered some belongings, but before leaving, he took the three younger

children in the bedroom, locked the door and told them that they were going to have to change their mother's mind or he would never see them again. Appellant phoned Diana several times that day and evening, until she finally had to take the phone off the hook.

The next day appellant's brother, Usmen, flew in from New York to try to talk Diana into giving appellant another chance, but Diana refused. Shortly thereafter appellant arrived at the Alladin home, and the whole family had supper together. After supper, Usmen took the children outside. While appellant and Diana were alone, appellant again tried to persuade Diana not to go through with the dissolution. Diana told appellant that she would not change her mind.

At approximately 10:00 p.m., everyone retired for the evening. Appellant and Diana continued to discuss the dissolution until an argument ensued. Diana went downstairs to sleep on the couch, but appellant followed her. They continued to argue. Diana claims appellant kicked her in the face. Diana threatened to call the police and ordered appellant out of the house. Appellant grabbed Diana and told her she was not calling anyone. Diana screamed for Omar, who came up from his bedroom and restrained appellant. Diana went into the kitchen to call the police, but appellant grabbed the telephone from Diana, disconnected it and threw it at Omar. Diana ran upstairs, woke up Usmen and ran into the master bedroom to use that phone. Appellant followed Diana and yanked the bedroom phone out of the wall.

Diana then went into the bathroom. Omar placed himself in the bathroom doorway, between appellant and Diana. Usmen was behind appellant. Appellant and Diana continued to argue. Diana and Omar claim that during the argument, appellant said:

> You won't live. If I don't kill you today, maybe tomorrow; not this week, maybe next; not this year, maybe three years from now. You won't live a day of peace in your life.

Usmen remembers only the argument, he does not recall hearing any threatening language. Appellant admitted grabbing Diana, but denied hitting, kicking or threatening her. Eventually, everyone went back to bed. Appellant and Usmen left early the next morning.

Appellant spent most of the following week at his apartment in Hopkins, but called Diana several times. He finally seemed to accept the dissolution. They discussed visitation and division of their assets. Appellant hired an attorney. Appellant's attorney contacted Diana about allowing appellant to visit with the children on Saturday, April 12. Appellant had seemed rational and realistic on the phone, so Diana agreed to the visitation.

On Saturday morning, Diana and the three younger children met appellant at a parking lot. When appellant arrived at the parking lot, he got into Diana's car and again tried to persuade her to change her mind about the dissolution. After they had been arguing for about a half hour, the parking lot attendant asked them to leave. When appellant drove off with the children, Diana did not know where he would be taking them. He was to return the children to his sister-in-law's that evening.

Appellant and the children arrived at the Alladin home before Diana. The house was locked, so appellant told Chad to pound on Omar's bedroom window to let them in to get their swimming suits. Omar opened the door and went back downstairs to his bedroom.

When Diana arrived, she was angry that appellant was in the house violating the family court order. Appellant and Diana got into a heated argument. At one point, appellant said he wanted his VCR. Omar went downstairs to get it. When they were alone, appellant grabbed a meat cleaver and struck Diana on the side of the head with it.

Appellant testified that he just "snapped" and that he could not recall how many times he hit Diana. Diana testified that she felt blood running down her face, that appellant struck her again on the top of the head, and that she screamed for

Omar. Omar dropped the VCR, ran upstairs, and grabbed appellant from behind. All three of them fell to the floor. As they fell down, Diana was struck with the meat cleaver two more times.

Appellant was on top of Diana, still holding the meat cleaver when Omar grabbed the handle and pried the meat cleaver from appellant's hand. Diana testified that when she was able to get free, she started toward the front door and told Omar to go to the neighbors and call the police. Omar ran outside, threw the meat cleaver on the front lawn, and ran to the neighbor's for help.

Inside, appellant grabbed Diana again and they fell to the floor in the hallway. Straddling Diana, appellant put his hands around her throat and tried to strangle her. Diana testified that she was unable to breathe or call out and that she believed she was about to die. Diana recalls trying to pry appellant's hands loose, having a hold of him by his hair, and that she had his finger in her mouth "biting it for all it was worth." Appellant denies ever having any intent to hurt or kill his wife.

The three younger children, after hearing their mother scream and seeing Omar come outside with the meat cleaver in his hand and blood all over his clothes, got out of the car and ran into the house. Desiree sat down on the stairs and cried. Omar, Chad and Andre went into the hallway to see appellant on top of their mother with his hands around her throat. Omar pulled appellant off Diana, and then both he and Diana ran outside screaming for help. A neighbor helped Diana into his house and called an ambulance.

Appellant grabbed Desiree and took her up to the master bedroom, barricaded the door and pulled down all the shades. When the police arrived, the officer called out for appellant to release Desiree and come out with his hands raised. Appellant told the officer that he had a gun and that he would kill Desiree. The officers told appellant that if he stopped talking to them, they would forcibly enter the bedroom. Officers negotiated with appellant for approximately five hours. During this time, appellant told the officers approximately 50 to 60 times, "Don't push me or I will harm the girl. Any injury to the girl will fall on your heads."

At approximately 4:00 p.m., police officers broke down the door and entered the bedroom. Desiree was huddled on the floor next to the bed crying, but was unharmed. She was looking into the closet saying, "Daddy." Police found appellant with a bathrobe belt around his throat, hanging from the clothes rod in the closet. When the paramedics checked appellant they found no injuries and no visible marks on appellant's neck. At trial, appellant stipulated that he took Desiree to the bedroom and kept her there against her will as a hostage.

Diana was taken to the emergency room. She had lost about two units of blood and was in shock. Diana had sustained three deep lacerations of her scalp, all of which caused chip fractures of her skull. She also sustained a deep laceration to the back of her neck, lacerations on both hands, which resulted in disfunction of both forefingers, and a laceration to her left knee. The lacerations to the left temporal area of her head severed a nerve, resulting in permanent paralysis of the muscles of her forehead and eyebrow. The laceration on the top of her head went through the full thickness of the skull, ending about one-half centimeter from the brain. At that point the skull is about three quarters of an inch thick and quite dense. As a result, it took "a pretty good blow" to crack the skull in that fashion. Because the blow Diana sustained had been at an angle, the skull was not completely penetrated.

The jury found appellant not guilty of attempted first degree murder, but guilty of attempted second degree murder, first degree assault and kidnapping. Appellant was sentenced to 62 months for attempted second degree murder and to a consecutive 21 month term, execution stayed, with up to ten years probation for the kidnapping conviction. One of the conditions of appellant's probation is that he have no contact with Diana or his minor children except by mail without Diana's consent or, after the

age of majority, the consent of the child. No sentence was imposed for the assault conviction.

## ISSUES

1. Does the intentional confinement of a minor child by a non-custodial parent, for purposes of using the child as a shield or hostage, without the consent of the custodial parent, state an offense under the kidnapping statute, Minn.Stat. § 609.25?

2. Did the trial court err by imposing, as a condition of probation, that appellant have no contact with his wife or minor children, except by mail, without their mother's consent or, after the age of majority, the consent of the child?

3. Was the evidence sufficient, as a matter of law, to support appellant's conviction for attempted second degree murder?

4. Did the trial court err by failing to grant appellant's pretrial motion for change of venue where appellant withdrew the motion until jury selection and never renewed the motion at trial?

5. Did the trial court err by denying appellant's challenge for cause of four potential jurors?

## ANALYSIS

### I.

*Kidnapping*

■ Appellant challenges his kidnapping conviction on the ground that an essential element of the crime, lack of parental consent, is missing. Appellant contends that he could not have committed the crime of kidnapping because, as Desiree's parent, he provided himself with the requisite "consent of his parents or other legal custodian" to hold her hostage.

The applicability of Minnesota's kidnapping statute, Minn.Stat. § 609.25, to the prohibited acts committed by a parent against his own child appears to be a question of first impression. Minn.Stat. § 609.-25, subd. 1 (1984) provides:

Whoever, for any of the following purposes, confines or removes from one place to another, any person without his consent or, if he is under the age of 16 years, without the consent of his parents or other legal custodian, is guilty of kidnapping and may be sentenced as provided in subdivision 2: (1) to hold for ransom or reward for release, or as a shield or hostage * * *.

Appellant relies on three alternative theories to support his argument that he cannot be convicted for kidnapping his own child. First, appellant contends that there is a "general rule" which provides that in the absence of a legally effective court order awarding custody of a child to another, a parent does not commit the crime of kidnapping by taking exclusive possession of the child. This so called "general rule" is set forth in Annot. 20 A.L.R.4th 828 (1983 & Supp.1986). However, the annotation appellant relies on for support also cites several cases holding that a parent can be convicted of kidnapping for taking his own child away from the person to whom custody has been awarded by a court decree. See, e.g., State v. Kracker, 123 Ariz. 294, 599 P.2d 250 (Ct.App.1979); McNeely v. State, 181 Ind.App. 238, 391 N.E.2d 838 (1979); People v. Hyatt, 18 Cal.App.3d 618, 96 Cal.Rptr. 156, (4 Dist. 1971).

Appellant argues that the mere existence of a temporary order is insufficient to operate as an exception to the "general rule" and allow a parent to be charged with kidnapping his own child.

Appellant's argument that the temporary order is not a legally effective court order is without merit. Temporary orders are enforceable and can be the basis for contempt if violated. Furthermore, this court has recently held that a child custody determination includes temporary court orders. See Snow v. Snow, 369 N.W.2d 581 (Minn. Ct.App.1985).

Second, appellant argues that even if this court finds that the temporary order is a legally effective court order which would operate as an exception to the "general rule," he still cannot be convicted of kidnapping because he had Diana's consent to

visit the children and, therefore, was acting as Desiree's legal custodian on the day of the kidnapping. Thus, it is appellant's position that the kidnapping statute is inapplicable to him because, as Desiree's legal custodian, he gave himself consent to hold her hostage.

While Diana, the legal custodian, gave appellant permission to visit the children, she did not give appellant permission to barricade Desiree in the bedroom, threaten her life, and hold her hostage for over five hours. Other jurisdictions have found that, even though a parent picks up a child during authorized visiting hours, it does not negate a finding that the parent had the intent to detain and conceal the child. *See e.g., People v. Williams,* 105 Ill.App.3d 372, 61 Ill.Dec. 259, 434 N.E.2d 412 (1982) (mother committed crime of child abduction where she picked child up at school and concealed her at neighbor's home overnight); *People v. Hyatt,* 18 Cal.App.3d 618, 96 Cal.Rptr. 156; *State v. Holtcamp,* 614 S.W.2d 389 (Tenn.Crim.App.1980) (kidnapping statute applies to mother who took child during authorized visit and kept her out of state for one month); *State v. Crafton,* 15 Ohio App.2d 160, 239 N.E.2d 571 (1968) (proper to convict mother of child stealing where mother took children away from father who had been awarded custody); *Lee v. People,* 53 Colo. 507, 127 P. 1023 (1912) (father picked up child during permitted visit and fled the state; a child is as fully protected from being stolen and carried away by the parent divested of custody as it is protected from any other person).

■ Third, appellant argues that he should have been charged with violation of Minn.Stat. § 609.26, "Depriving Another of Custodial or Parental Rights," instead of Minn.Stat. § 609.25, "Kidnapping." Minn. Stat. § 609.26, subd. 5, mandates dismissal of the charge if the perpetrator voluntarily returns the child within 14 days of the taking. Although Minn.Stat. § 609.26 may have been an optional charge (that question is not before us), the facts justified the State's use of the more severe kidnapping statute.

The plain meaning of Minn.Stat. § 609.25 gives the State the right to charge appellant under it if the State feels it can prove the essential elements of the crime. To construe the kidnapping statute as appellant suggests would be overly restrictive and could lead to the absurd result of bona fide kidnapping going unpunished if the return provisions of Minn.Stat. § 609.26, subd. 5(a) were complied with. A legislature does not intend absurd results. *Salmen v. City of St. Paul,* 281 N.W.2d 355, 361 n. 8 (Minn.1979) (court may presume that legislature did not intend an absurd result). It is unreasonable to construe the "consent of his parents or legal guardian" language of Minn.Stat. § 609.25 to mean the consent of the person committing the crime. Furthermore, public policy, including recent legislative concern for abuse by parents and legal custodians, and parallel developments in tort law abrogating the parent-child immunity, supports a finding that, depending on the facts, a parent could be convicted of kidnapping his own child. *See* Minn.Stat. § 609.341, et seq. (1986); *American Family Mutual Insurance Co. v. Ryan,* 330 N.W.2d 113 (Minn.1983).

In this case, there was a hostage taking in the true sense of the word. Appellant stipulated that he took Desiree to the bedroom and kept her there against her will as a hostage. The record shows that he did so without the consent of Desiree's legal custodian, her mother. All elements of the kidnapping statute have been met.

## II.

### *Condition of Probation*

■ Next, appellant contends that the trial court abused its discretion by setting as a probationary condition of the 21–month stayed kidnapping conviction that appellant refrain from having any contact with Diana or his minor children without Diana's consent except by mail, or, after the age of majority, the consent of the child. It is appellant's position that restricting his contact with his minor children is unreasonable and void as against public policy. The sentencing judge has broad discretion when setting the conditions of

probation. *State v. Niemczyk*, 400 N.W.2d 401, 404 (Minn.Ct.App.1986).

In *Koop v. Koop*, 378 N.W.2d 121, 124 (Minn.Ct.App.1985), appellant was sentenced to 81 months imprisonment for attempted second degree murder as a result of his attack upon his ex-wife. We held that Koop's character threatened the emotional health of his child and, therefore, met the statutory requirements to deny his visitation rights under Minn.Stat. § 518.-175, subd. 5. In this case, the facts are even more egregious. Not only did appellant attack his wife with a meat cleaver, but he held his five year old daughter hostage for over five hours, threatened to kill her, and exposed her to extreme harm should the police officers have made the determination to make a forcible entry into the bedroom to capture appellant.

Given the facts of this case and our holding in *Koop*, we find that the trial court did not abuse its discretion by requiring as a condition of his probation that he refrain from any contact with Diana or his minor children, except by mail, without Diana's consent. Affirming the probation conditions at this time does not preclude appellant from making a subsequent motion for visitation rights. *Koop*, 398 N.W.2d at 124.

### III.

*Sufficiency of the Evidence*

■ This court's scope of review on appeal of sufficiency of the evidence is limited to making a painstaking review of the record to determine whether the evidence, viewed most favorably to support a finding of guilt, is sufficient to permit the jury to reach the conclusion that it did. *State v. Martin*, 293 N.W.2d. 54, 55 (Minn.1980).

An essential element of the crime of attempted second degree murder is that appellant acted with intent to kill. Appellant has the requisite intent if he:

> either has a purpose to do the thing or cause the result specified or believes that

the act, if successful, will cause the result.

Minn.Stat. § 609.02, subd. 9(4) (1986).

Intent, like premeditation, is a permissible inference from all the facts and circumstances and is a jury question. The task of inference is for the jury. *State v. Marsyla*, 269 N.W.2d 2, 5 (Minn.1978). Where there is a question of whether the defendant intended to kill or only injure, any conclusion must be drawn from the totality of circumstances. *Id.* This includes the defendant's conduct and defendant's statements made at the time of the act. *State v. Whisonant*, 331 N.W.2d 766, 768 (Minn. 1983).

Appellant argues that he did not have the requisite intent because he just "snapped" and does not recall how many times he struck Diana with the meat cleaver. Appellant denies ever having threatened Diana, or having any intent to hurt or kill her. His interpretation of the events that occurred on April 12, 1986, is that they were "a sudden assault committed without the intent to kill."

Reviewing the evidence in the light most favorable to support the verdict, we find that the evidence is sufficient to support the jury's conclusion. Appellant's intent to kill is evidenced by his repeated attack upon Diana with a meat cleaver and his attempted strangulation. Although blood ran down Diana's face, appellant continued to strike her and then inflict injury on her neck.

### IV.

*Change of Venue*

■ Approximately one week before trial was scheduled to begin, appellant brought a motion for change of venue based on prejudicial pretrial publicity. At the change of venue hearing, defense counsel stated:

> I would just continue the motion at this time, with the court assent, and we can take up the matter, if necessary,

after voir dire if it appears we are going to have a problem there * * *.

The trial court concluded by stating:

There will be no ruling under the posture of the case as to the change of venue motion. If we have trouble getting a jury at some point, that motion can, in effect, be renewed * * *.

Defense counsel never renewed its motion for change of venue. Appellant cannot claim that the trial court, which was never asked to make a ruling on change of venue, abused its discretion. *See Johnson v. St. Charles Municipal Liquor Store*, 392 N.W.2d 909, 912 (Minn.Ct.App.1986) (appellant cannot claim trial court abused its discretion by excluding evidence which was never offered).

It is appellant's position that, by failing to rule on his motion for change of venue, the trial court, in effect, denied his motion. By denying the motion for change of venue, appellant argues that the trial court abused its discretion and denied him his constitutional right to a fair trial.

Even if the trial court's refusal to rule, *arguendo*, was a denial of the motion for a change of venue, the standard to be used to determine whether the venue of a criminal prosecution should be changed is abuse of discretion. *State v. Salas*, 306 N.W.2d 832, 835 (Minn.1981). Before we can conclude that the court has abused its discretion, it must be shown that a real possibility exists that the jury will not render an unprejudiced or unbiased verdict. *Id.*

Minn.R.Crim.P. 25.02, subd. 3, sets forth the following standard for change of venue:

A motion for * * * change of venue shall be granted whenever it is determined that the dissemination of potentially prejudicial material creates a reasonable likelihood that in absence of such relief, a fair trial cannot be had. A showing of actual prejudice shall not be required.

■ A review of the relevant newspaper articles reveals that the reports were factual in nature. The only information which could possibly be said to prejudice appel-

lant are references in two of the articles of prior abuse in the Alladin home. Factual news reports are generally insufficient to establish that pretrial publicity was prejudicial. Opinions or implications of the defendant's guilt are required. *Salas*, 306 N.W.2d at 835.

Appellant also claims that prejudice is shown by the voir dire transcript where only four of the twenty-four jurors questioned had not heard of the case. However, in *Salas*, the supreme court held that prejudice among some voir dire examinees or exposure of some jurors to news reports before trial does not mean the jury was biased. *Salas*. 306 N.W.2d at 336.

Although the April 12, 1986, incident did involve pretrial publicity, it is not the type of publicity that has been characterized as prejudicial by other decisions in this jurisdiction. *State v. Swain*, 269 N.W.2d 707, 720 (Minn.1978) (trial court did not abuse discretion when it denied change of venue where news reports were factual); *State v. Annis*, 291 Minn. 552, 553, 192 N.W.2d 419, 420 (1971) (per curiam) (trial court did not err when it denied change of venue where news reports were factual).

■ Even if the trial court's refusal to rule on the motion for change of venue is a denial of that motion, appellant has not shown a real possibility that the news reports interfered with an unprejudiced or unbiased verdict. Therefore, we hold that the trial court did not abuse its discretion by denying appellant's motion for change of venue. *See Salas* at 836.

## V.

### Challenge for Cause

Finally, appellant claims that by denying his challenge for cause of four potential jurors, the trial court abused its discretion and violated his constitutional right to a fair and impartial jury guaranteed under the sixth amendment.

Minn.R.Crim.P. 26.02, subd. 5, provides the exclusive grounds upon which jurors can be challenged for implied bias. *State v. Stufflebean*, 329 N.W.2d 314, 318 (Minn.

1983). Minn.Crim.P. 26.02, subd. 5(1) provides:

A juror may be challenged for cause by either party upon the following grounds:

1. The existence of a state of mind on the part of the juror, in reference to the case or to either party, which satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the party challenging.

■ A juror must simply undertake to try the case fairly, and the trial judge, being in the best position to observe and assess the demeanor of the prospective juror, is to be given deference in determining whether the juror should be removed for cause. *State v. Graham,* 371 N.W.2d 204, 206 (Minn.1985). In an appeal based on juror bias, appellant must show that: (1) the challenged juror was subject to challenge for cause; (2) actual prejudice resulted from the failure to dismiss the juror; and (3) an appropriate objection was made by appellant. *Stufflebean,* 329 N.W.2d at 317.

■ In this case, jury selection was conducted individually. Appellant challenged eight jurors for cause. The trial court honored four challenges. Three others were eliminated by appellant's peremptory challenge. Only one prospective juror challenged for cause served on the jury. Appellant accepted that juror to serve on his jury when he still had one unused peremptory challenge.

Appellant claims that actual prejudice resulted from the court's failure to dismiss the challenged jurors because appellant had to use three peremptory challenges on those jurors. Appellant's claimed prejudice falls short of the kind of prejudice which must be shown in order to prevail on such a claim. *See e.g., Stufflebean,* 329 N.W.2d at 318 (where no actual bias or prejudice shown, mere exhaustion of all peremptory strikes prior to reaching last challenged juror is insufficient); *State v. Williams,* 361 N.W.2d 473 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. April 12, 1985) (no prejudice shown where appellant failed to use peremptory strike to remove challenged juror); *Cf. Alholm v. Wilt,* 394 N.W.2d 488, 494 n. 10 (Minn.1986) (in discussing the applicability of *Stufflebean* requirement that actual prejudice be shown, court noted that in *Stufflebean* appellant had an unused peremptory challenge but failed to exercise it to strike a prospective juror).

The juror in question had never been called for jury duty before. She testified that the Alladins' interracial marriage presented no problems for her and that she had read one newspaper article about the case, felt sympathy for the child, but had formed no opinion as to appellant's guilt or innocence. The juror conceded that because a relative of hers had been abused, the fact that this case involved a domestic assault might influence her decision. She further testified that she might empathize with Diana, but that she would "have to hear the facts first before I judge." The court did not sustain appellant's challenge for cause at that time, but allowed further questioning.

In response to further questioning by defense counsel, the juror testified that she could put her personal feelings aside and make a credible determination based solely upon the evidence admitted at trial. Appellant's challenge for cause was not renewed. Instead of using a peremptory challenge, appellant accepted the juror to serve on his jury.

In sum, the juror testified that she could be fair and impartial and that she could put any sympathies aside and decide the case solely on the basis of evidence adduced at trial. We find that the trial court's refusal to allow appellant's challenge for cause was not an abuse of discretion. *See State v. Huseth,* 375 N.W.2d 846 (Minn.Ct.App. 1985), *pet. for rev. denied* (Minn. Dec. 30, 1985) (*Stufflebean* standard not met where juror was the wife of an officer of the police department); *Graham,* 371 N.W.2d 204 (trial court did not err by refusing to excuse juror who stated she had assumed defendant guilty from news accounts but now believed she could presume defendant innocent and fairly try the case);

*Williams,* 361 N.W.2d 473 (trial court refused to excuse juror who had been victim of armed robbery twice but stated that he could be fair and impartial; peremptory strike was not used); *State v. Stewart,* 360 N.W.2d 430, 432 (Minn.Ct.App.1985); *City of St. Paul v. Hilger,* 300 Minn. 522, 220 N.W.2d 350 (1974) (trial court did not err by refusing to excuse juror who was acquainted with store detective who made arrest at bar that both frequented but testified that it would not prevent him from being fair and impartial).

## DECISION

On these facts, the State was not restricted to charging appellant with depriving another of custodial or parental rights. Minn.Stat. § 609.26. The State could use the kidnapping statute. The trial court did not err by imposing conditions on appellant's probation. The evidence was sufficient to support the conviction for attempted second degree murder. The trial court did not err by not granting appellant a change in venue. The trial court did not err by denying appellant's challenges for cause.

Affirmed.