**Kenneth E. BYRD, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 95–CF–1734.**

District of Columbia Court of Appeals.

Argued Sept. 4, 1997.

Decided Oct. 2, 1997.

Alan L. Balaran, Washington, DC, appointed by the court, for appellant.

Theodore C. Marcus, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas C. Black and Abby J. Stavistsky, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, FARRELL, and REID, Associate Judges.

FARRELL, Associate Judge:

On this appeal from his convictions for kidnapping, assault with a dangerous weapon (gasoline), and arson, appellant contends chiefly that the trial judge erred in not submitting to the jury the issue of whether he stood *in loco parentis* to the children he was charged with kidnapping, thus depriving him of a defense afforded by the statute.[1] The meaning of "parent" as used in the kidnapping statute is a novel issue in this jurisdiction. We hold, in keeping with decisions interpreting the identical exception in the federal kidnapping statute, that a step-parent acting *in loco parentis* may be a "parent" within the statute. Further, having present-

---

1. In relevant part, the District's kidnapping statute states: "Whoever shall be guilty of ... seizing, confining, ... kidnapping, abducting, concealing, or carrying away any individual ... and holding or detaining ... such individual for ransom or reward *or otherwise, except, in the case of a minor, by a parent therefore,* shall ... be punished by imprisonment for life or for such term as the court in its discretion may determine." D.C.Code § 22–2101 (1996) (emphasis added).

ed some evidence that he was a surrogate parent, appellant was entitled to have the jury decide, on proper instructions, whether he was acting as a parent at the time of the kidnapping. We conclude, however, that the failure to submit the issue to the jury was harmless error beyond a reasonable doubt, because a properly instructed jury could not reasonably have acquitted appellant of kidnapping while convicting him—as the jury did—of the crimes of assaulting the children with a dangerous weapon and arson. In short, the facts the jury necessarily found in returning the latter two convictions would have made an acquittal for kidnapping irrational. Since we reject as well appellant's remaining arguments, we affirm all of his convictions.

## I.

Theresa Byrd met appellant in July 1988. At the time, she had four children including (as the oldest) Tiffany and Tion, age 13 and 12 at the time of trial. In December of that year Ms. Byrd married appellant, and in time they had two children. The family of eight lived together until July 1993 when Ms. Byrd and the children moved to a separate apartment. Although she continued to see appellant "on a regular basis, ... sometimes with the children," by the summer of 1994 she had told him of her intent to divorce him. Since August of 1994 appellant had not seen the children and was under a court order—the terms of which are not set forth in the record—to stay away from Ms. Byrd.

According to the government's evidence, on the evening of October 10, 1994, the children were home alone when appellant came to the apartment. Learning that Ms. Byrd was visiting a male friend, he became angry and struck Tiffany and Tion. He then ushered all of the children into a car driven by his brother. They drove to a gas station where, within earshot of the children, appellant telephoned Ms. Byrd, asked if she loved her male friend, and threatened to "burn the car up with the kids in it" if she did not leave at once. Appellant then filled a portable container with gasoline and drove to a house,

owned by his parents but now unoccupied, at Upshur Street, N.E. There he asked Tiffany which of the children he "should take with [him]" into the house. At her suggestion he took Tion and herself, letting the others ride away with his brother. Appellant took the two children up to the attic where he proceeded to block the stairs leading down to the second floor with chairs and other objects, and pour gasoline on those objects. Eventually he sat down between Tiffany and Tion, placed a chair over their legs, and poured gasoline in a half-circle around them. Asking Tiffany why she had not told him about her mother's male friend, he told her that "his life was over that night because he wasn't going back to jail," and that if their mother would not talk to him, "he was going to burn [the children] up."

Meanwhile, Ms. Byrd had called the police. When they arrived at the Upshur Street house, they tried to negotiate with appellant unsuccessfully. Early in the morning Tiffany awoke to see fire. Tion had awoken earlier and saw appellant set the fire. A police officer who rushed up the stairs into the attic saw appellant "going toward the fire" holding Tion; he "looked like he was trying to put him in the fire." Tion broke loose and came toward the officer, but appellant reached out to grab him. The officer then shot and wounded appellant, and the children were rescued.

## II.

Appellant's principal argument is that the trial court erroneously withheld from the jury his defense that he was a "parent," hence could not be convicted of kidnapping. See note 1, *supra.* The trial judge raised the issue *sua sponte* before trial, inquiring whether a step-father who kidnaps his children may avail himself of the statutory exception. While skeptical on the point,[2] the judge suggested that the parties research the issue. They provided him with no case law on the point, and ultimately he declined to instruct the jury on the defense, stating: "[U]nlike a parent, a step-parent or someone

---

2. "It may be that the long and short answer to this question is he is not a parent, he is a step-

parent, and the statute doesn't mean to exempt step-parents."

in the position of Mr. Byrd with respect to these children is capable of kidnapping the children.... The real question ... is whether Mr. Byrd is a parent within the meaning of [the] statute, and I conclude that he is not."

■ On appeal, appellant argues that a step-parent standing *in loco parentis* may indeed be a "parent" within the statute, and that he presented enough evidence of surrogate parentage to require submission of the issue to the jury. The question of whether a "parent" under § 22–2101 may include a step-parent is, of course, one of law. *See United States v. Floyd,* 81 F.3d 1517, 1522 (10th Cir.1996) (construing same exception under federal kidnapping statute, 18 U.S.C. § 1201). We have not had occasion to decide the issue before. We hold, in accordance with decisions interpreting the same federal exception, that a "parent" may include someone *in loco parentis.*[3] Specifically, we agree with the court in *Floyd* (which was decided after the trial in this case) that "a person who stands in the place of a biological parent at the time of a kidnapping is exempt from prosecution pursuant to [the kidnapping statute]." 81 F.3d at 1523. *Floyd* is persuasive on this point, and we adopt its reasoning. *See id.* at 1522–23.

■ The next question is who decides whether a defendant stood *in loco parentis* at the time of the kidnapping, the court or the jury. *Floyd's* characterization of the defense as an "exempt[ion] from prosecution" would suggest that the issue, although requiring factual findings, is ultimately one of law for the court to decide on a motion to dismiss the indictment. The government somewhat tentatively advanced this position to us at oral argument.[4] Certainly it would be the correct one if the statute expressly "preclude[d] the arrest and prosecution" of a

parent for kidnapping. In *Stein v. United States,* 532 A.2d 641 (D.C.1987), we relied on that statutory language to hold that the immunity conferred upon a person who complies with the "abandon[ment]" requirements of the unregistered firearm possession statute presents an issue "separate from the merits" of the case (*i.e.,* guilt or innocence), hence is appealable before trial. *Id.* at 644. But the text of the kidnapping statute, note 1, *supra,* contains no such express bar to prosecution. Instead the exception appears to be embedded in the definition of the crime as a qualification of the purpose—or, precisely, the absence of specific purpose ("for ransom or reward or *otherwise* ")—which the government must prove as an element of the offense. *See* discussion of legislative history, *infra.* The issue is not an easy one, but we conclude that once a defendant "bring[s] himself within the [parent] exception," *Miller v. United States,* 123 F.2d 715, 718 (8th Cir. 1941), *rev'd on other grounds,* 317 U.S. 192, 63 S.Ct. 187, 87 L.Ed. 179 (1942), by presenting some evidence that he was a "parent" within the statutory meaning, the jury must be allowed to decide that issue on proper instructions as part of the ultimate question of whether the government has proven its case beyond a reasonable doubt. *Cf. id.* at 716–17 (trial court refused to submit issue of parentage to jury and court of appeals sustained ruling because "the evidence is barren of any fact or circumstance which would even remotely tend to establish the relation of parent and child at the time of the offense as between the appellant and the person he kidnaped"). *See also United States v. Gaudin,* 515 U.S. 506, 511, 115 S.Ct. 2310, 2314, 132 L.Ed.2d 444 (1995) ("[T]he application-of-legal-standard-to-fact sort of question ...,  commonly called a 'mixed question of law and fact,' has typically been resolved by juries").

---

**3.** The parent exemption first appeared in D.C.Code § 22–2101 in 1965 as part of an overall effort by Congress to "[c]onform[ ] the existing local law relating to kidnaping to the Federal statute [18 U.S.C. § 1201] applicable in all other Federal jurisdictions." S.Rep. No. 89–623, at 4 (1965); H.R.Rep. No. 89–1129, at 4 (1965). *See Sinclair v. United States,* 388 A.2d 1201, 1206 n. 12 (D.C.1978). Thus, construction of the District's statute is aided by reference to the federal legislation and case law thereunder.

**4.** In a post-argument letter the government informs us that it never received appellant's reply brief asserting (despite contrary indications in his opening brief) that the parent exception is ultimately a jury issue; the government offers to brief the issue supplementally. We have concluded that no additional briefing of the issue is necessary.

■ In this case, appellant presented some evidence that ever since his marriage to Ms. Byrd in 1988 he had provided food and shelter to her children (including Tiffany and Tion) and generally acted as their parent.[5] He maintained that his action in removing the children from the mother's home was motivated by concern for their safety, as they were home alone in an unsafe neighborhood. He also contended, however improbably, that he stopped to buy gasoline in order to fuel a space-heater in his parents' former house (now unoccupied) to which he was taking the children. And he denied that he had forced them to stay with him in the house against their will or had poured and ignited gasoline there, implying the fire had started accidentally. We think appellant at least raised an issue of law and fact as to whether he was a "parent" enough to require submitting the question to the jury.

But that conclusion does not nearly end our inquiry. We must still ask whether or not failure to put the issue to the jury was harmless error. Treating the issue as a constitutional one, we hold that the error was constitutionally harmless because, as we now demonstrate, a jury properly instructed on the parent exception and its limitations could not reasonably have acquitted appellant on the basis of the exception while convicting him of assault with a dangerous weapon and arson, as it did. *See White v. United States,* 613 A.2d 869 (D.C.1992) (en banc).

■ Since the *in loco parentis* status is a temporary one which the parent may relinquish at any time by voluntary conduct, *see Jackson v. Jackson,* 278 A.2d 114, 115 (D.C. 1971), the question the jury would have had to decide here is whether appellant "continued to fulfill the responsibilities of a parent *at the time of the kidnapping." Floyd,* 81 F.3d at 1524 (emphasis added). The government argues that, in the case of one claiming surrogate parentage, the conduct and purpose of the defendant while detaining a child against its will must be at least minimally consistent with the affection and regard a

parent would manifest toward a child, otherwise the defendant forfeits the protection of the parent exception. The government points to the fact that the exception was added to the kidnapping statute [6] for a narrow reason: to take into account what has been termed "technical" kidnapping of children by a parent. The addition became necessary when in 1934 Congress expanded the purposes for which a kidnapping could be done from "ransom or reward" to "ransom or reward *or otherwise." United States v. Sheek,* 990 F.2d 150, 151–52 (4th Cir.1993). As the Supreme Court stated soon afterwards,

> [t]he words 'except, in the case of a minor, by a parent thereof' emphasize the intended result of the enactment. They indicate legislative understanding that in their absence a parent, who carried his child away *because of affection,* might subject himself to condemnation of the statute.

*Gooch v. United States,* 297 U.S. 124, 129, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936) (emphasis added; citation omitted). The Conference Report on the amendments explained that "the [parental exemption] amendment excludes from the operation of the act forbidding the transportation of kidnaped persons ... the *technical* case of a minor 'kidnaped' by a parent thereof." H.R.Rep. No. 73–1595, at 2 (1934) (emphasis added). The intent was that a parent who kidnapped a child, however misguidedly, out of affection and disagreement over custody should not be prosecuted for that act alone. *See Miller,* 123 F.2d at 716–17 ("Congress was primarily concerned with" parents who, "when domestic difficulty arises, ... [and] because of affection for their children, inveigle or spirit them away.").

In light of this purpose, the government relies on a wealth of decisions by state courts construing an equivalent parental authority defense under their kidnapping statutes and holding that additional felonious conduct by the defendant which exposes the child to real

---

**5.** The government argues that this evidence was weak under our decisions defining the concept of *in loco parentis,* but given the trial court's ruling that a step-parent cannot claim the exception, we cannot fault appellant for not having developed

further the factual record, if any, of his history of care and support for the children.

**6.** See note 3, *supra.*

or threatened harm during the kidnapping defeats application of the defense. In *State v. Alladin,* 408 N.W.2d 642 (Minn.Ct.App. 1987), for example, the defendant, angry that his wife had ended their relationship, forcibly took his daughter into the bedroom and threatened to "harm the girl" if police at the scene "push[ed]" him. *Id.* at 645. Rejecting a defense of parental authority, the court concluded that this was a "hostage taking in the true sense of the word" and hence met the definition of kidnapping. *Id.* at 647; *accord, Lafleur v. State,* 661 So.2d 346, 348–49 (Fla.Dist.Ct.App.1995). Other decisions have likewise made the defense inapplicable when a parent confines a child by coercion intending to commit other criminal acts either upon or by means of the child. Thus, in *State v. Viramontes,* 163 Ariz. 334, 788 P.2d 67 (1990), the parent's purpose, far from being "to provide the child with shelter," was to abandon the newborn infant in a public parking lot. *Id.* 788 P.2d at 70. In *State v. Tuitasi,* 46 Wash.App. 206, 729 P.2d 75 (1986), the parent's intent in threatening to kidnap the child was to force the estranged mother to have sex with him. The defendant thereby exceeded his "legal authority," and was properly convicted of kidnapping since a parent forfeits the equal right to custody by seizing the child and "engag[ing] in misconduct affecting the child's well being." *Id.* 729 P.2d at 77. And in *State v. Siemer,* 454 N.W.2d 857 (Iowa 1990), the parent could not assert the *in loco parentis* relationship as a defense to a kidnapping marked by repeated acts of cruelty and torture:

> The harm the kidnapping statute addresses is *unlawful* confinement or asportation which increases the potential or actual injury to the victim. While a parent has the authority to confine or remove a child under reasonable circumstances, we can conceive of no circumstance under which a parent could lawfully exercise such authority while harboring the intent to sexually abuse or *subject the child to serious injury.*

*Id.* at 864 (second emphasis added; citation omitted).

We agree with the principles stated in these decisions, and hold that in the case of a defendant claiming *in loco parentis* status, the parent exception to the District's kidnapping statute is not a defense where the defendant has engaged in separate felonious conduct during the kidnapping which exposes the child to a serious risk of death or bodily injury.[7] That limitation is fully consistent with the purpose for which Congress adopted the parent exception in the first place. A jury, therefore, must be instructed in accordance with the limitation.

Under such an instruction, however, and in light of the findings which the jury did make beyond a reasonable doubt in this case, the jury could not rationally have found appellant not guilty of kidnapping based on the parent exception. The jury convicted him of the felonies of assault with a dangerous weapon (gasoline) and arson. It thus necessarily found that while he seized and held the two children overnight against their will, he placed them in fear of death or serious bodily harm by spreading gasoline around them and then lighting fire to the room in which they were imprisoned—his explanation being that he would "burn [them] up" if their mother did not talk to him and that "his life was over that night." This case thus falls within the rule enunciated by the Supreme Court and applied by this court in *White v. United States, supra,* that reversal is unwarranted for instructional error "where the relevant facts are so closely related that no rational jury, shown by its verdict to have found the facts necessary to convict the defendant under the instructions as given, could have failed, if fully instructed on each element, to have found in addition the facts necessary to comprise the omitted element." 613 A.2d at 879 (footnote omitted) (applying rule of, *inter alia, Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987) and *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)). The jury's findings with respect to the other felonies did

---

7. We have no occasion to consider here whether a biological parent may similarly forfeit the protection of the exception.

complete service for the omitted instruction and finding on the parent exception.

■ Appellant seeks to avoid this result by contending that some or all of the jurors might not have rested their conclusion of kidnapping on his use of the children as hostages at the Upshur Street house or even before then at the gas station (where he threatened to burn them in the car). Instead, he says, some might have focused exclusively on his initial act of abducting the children from their mother's home at a time when, if they believed his testimony, he had not yet formed an intent to assault the children but rather was concerned with their safety alone in that home [8]—at a time when, in other words, his actions were still shielded by the parent exception. But aside from positing a Mr. Hyde/Dr. Jekyll transformation in appellant's state of mind, this supposed fragmentation of events ignores the continuous nature of kidnapping and the progressively more menacing confinement to which appellant subjected the children here—culminating, as the jury found, in his torching the house and placing them in immediate fear of death or serious injury. "Kidnapping includes the seizing, confining, or detention of another," *Butler v. United States,* 614 A.2d 875, 884 (D.C.1992); it thus continues as long as the detention endures. The hypothesis that one or more jurors disregarded portions of the ongoing confinement, especially those revealing most graphically the children's plight as hostages, is contrary to the instructional definition of the crime and thus no basis on which to dispute that a jury instructed on the parent exception and its limits, having found that appellant assaulted the children using gasoline, would necessarily have rejected that defense.

### III.

■ Appellant contends that the evidence was insufficient to support his arson conviction because the government failed to prove that the burned house was "in whole or in part, [property] *of another person.*" D.C.Code § 22–401 (emphasis added). While the government in its case indeed presented no evidence of who owned the Upshur Street house, appellant supplied the missing proof in his testimony. *See Franey v. United States,* 382 A.2d 1019, 1021–22 (D.C.1978). Asked, "Now, this is the house that is owned by your family, is that correct, your parents?", he answered, "Yes, ma'am." He explained that he had been "raised there" but that since the time a fire damaged the house in 1985, his parents generally had not lived there, though this father and two of his brothers "stayed there for a while at one time, and I stayed there for a while myself." This evidence reasonably allowed the jury to conclude that at the time of the charged arson, the house belonged to someone "[ ]other" than appellant. *See also Carmon v. United States,* 498 A.2d 580, 582–83 (D.C. 1985) ("not necessary to prove exactly who the owner of the [property] was, but merely that the owner ... was someone other than appellant").

■ Finally, appellant contends that the trial judge erred in employing the analogy of use of a handgun when, in response to a request for reinstruction, he explained for the jury the difference between assault with intent to kill while armed and the lesser included assault with a deadly or dangerous weapon. We find no abuse of discretion in the manner of reinstruction. The judge told the jury: "I have deliberately picked an analogy that *has absolutely nothing to do with this case* because I don't want it construed by you as my commenting on the evidence in this case or what you should find from the evidence" (emphasis added). That instruction neutralized any risk of prejudice from the comparison to use of a gun.

*Affirmed.*

---

**8.** This despite the testimony of Tiffany and Tion that he struck them both on entering and learning of their mother's visit to a male friend.