Theodore R. SIMMS, Jr., Appellant,

v.

UNITED STATES, Appellee.

No. 02–CF–1165.

District of Columbia Court of Appeals.

Argued Dec. 15, 2004.
Decided Jan. 27, 2005.

Jonathan W. Anderson, Public Defender Service, with whom James Klein and Jaclyn S. Frankfurt, Public Defender Service, were on the brief, for appellant.

Emily A. Miller, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese III, Lionel Andre and Toni B. Florence, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and WASHINGTON, Associate Judges, and KRAVITZ, Associate Judge, Superior

Court of the District of Columbia.*

SCHWELB, Associate Judge:

Following a jury trial, Theodore R. Simms, Jr., was found guilty of simple assault. The jury acquitted Simms of aggravated assault, first-degree cruelty to children, and second-degree cruelty to children. At the time of the offense, the victim, William Calloway, who was the son of Simms' fiancée, Pauline Calloway, was fourteen months old.

On appeal, Simms contends that he was acting *in loco parentis* and that the trial judge committed reversible error by refusing to instruct the jury on the defense of reasonable parental discipline. The government responds, *inter alia,* that no impartial jury could reasonably find that Simms was acting *in loco parentis,* and that there was therefore no evidentiary foundation for the requested instruction. We agree with the government and accordingly, we affirm.[1]

## I.

## THE EVIDENCE

### A. *William's injuries.*

On November 7, 2000, Michael Knaggs, a firefighter and emergency medical technician, responded to Simms' home after receiving a report that a father and child had fallen down a flight of stairs. When Knaggs arrived, Simms told him that William was his son. Simms confirmed that he had fallen down the stairs with William in his arms. Simms took Knaggs upstairs, and Knaggs found the child lying down,

holding his arm, and whimpering. Knaggs noted bruises on William's upper arm and a bite mark on his left arm. Knaggs recalled the bite mark because "there are some things that stand out in your head."

Knaggs took William to Children's Hospital, where the boy was found to have suffered numerous injuries, including three fractures of his left arm, two fractures of his right arm, several bite marks, and bruises all over his head, face and body. Simms indicated, both to Knaggs and to physicians at Children's Hospital, that William might have been bitten by a puppy. The bite marks, however, were human, and the parties ultimately so stipulated at trial. Because William's injuries appeared inconsistent with Simms' explanation of a fall down the stairs, and because they were so numerous, Dr. Maria Ieni, a Children's Hospital pediatrician, reported the matter to the District's Office of Child Protective Services.

Following Dr. Ieni's call, Sergeant Morani Hines and Detective Wallace of the Metropolitan Police Department (MPD) responded to Children's Hospital. After Simms had told them that he was prepared to talk about the incident, Hines and Wallace transported him to a police station where Simms made a videotaped statement which was subsequently introduced into evidence at his trial.

### B. *Simms' videotaped statement.*

In his statement, Simms asserted that on Sunday, November 5, 2000, his fiancée brought William to the home where Simms lived with his parents. Simms claimed that he had been slightly injured in an

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

1. In light of our disposition, we do not reach the government's alternative contention that, even assuming, *arguendo,* that Simms was acting *in loco parentis,* no impartial jury could rationally find that the discipline imposed by Simms on a 14–month–old child was reasonable. *Cf. Fabian v. State,* 235 Md. 306, 201 A.2d 511, 518 (1964) (holding that slapping a 2½ year old sleeping infant for bedwetting was excessive).

automobile accident on the preceding Friday night, and that he was therefore unable to perform his job as a chef for a few days. He therefore agreed to look after William, whom he claimed to regard as a son, while Ms. Calloway was at work.

Simms told the police that on the evening of Monday, November 6, he and some friends were playing video games in Simms' bedroom. On that evening, William had a slight fever. William was lying down in Simms' mother's room, and he knocked down a glass vase. Simms "used some force and smacked [William's] hand," and he "popped" (i.e., slapped) William on the thigh,[2] apparently to discipline him for knocking down the vase. Simms then "tucked William in the sheets real tight so he couldn't get out" and returned to his friends. Notwithstanding Simms' efforts to keep him tucked in, William got loose and was about to fall; Simms "tapped" or "popped" him again.

Simms further related that neither he nor William had slept during the night from Monday to Tuesday. On Tuesday morning, at Ms. Calloway's direction, Simms set out to give William a bottle. He picked William up and headed towards the stairs. En route, Simms was "playing" with William by shaking him, rubbing him, and putting William's arm in his (Simms') mouth and biting him on both arms in order to "make him laugh." Thereafter, as he was walking downstairs with William in his arms, Simms' leg buckled and he fell, dropping William as he did so. Simms may have accidentally bitten William as a result of the fall. William also hit his head.

A short time after the accident Simms noticed a bruise on the boy's forehead and a lump on his upper right thigh. William

was also unable to hold the bottle. Simms called Ms. Calloway who returned home and called an ambulance. The ambulance arrived and, as previously described, William was taken to Children's Hospital.

### C. The trial testimony.

At Simms' trial, the prosecution introduced expert testimony and medical evidence regarding William's injuries, and sought to prove that these injuries were not sustained in the manner described by Simms. Because Simms was acquitted of aggravated assault and cruelty to children, we find it unnecessary to describe this testimony. The government also introduced into evidence Simms' videotaped statement. Pauline Calloway, William's mother, did not testify.

Simms took the witness stand on his own behalf. His description of the events leading to the transportation of William to Children's Hospital generally conformed to his videotaped statement to the police, but there were some inconsistencies and elaborations. Simms testified that on the Tuesday morning, he was "nibbling" on William's left arm at the top of the staircase, not on both arms. He claimed that he told Dr. Ieni that William had been bitten by a puppy because "that was the only thing that I could think of at the time." He acknowledged that the bite mark on William's left arm "might have occurred while I was nibbling the baby" when he fell.

Simms acknowledged that he physically "disciplined" William over the weekend, and that he had done so in a similar fashion in the past. Although he denied that he had made William cry or caused any injury to the boy, he admitted that each time he "popped" William, he did so three

---

2. Simms explained at trial that "popping him is a form of spanking. It's a form of discipline."

times consecutively. He acknowledged having told Detective Wallace that he had "popped" William on the leg four times over the vase and several more times for not sleeping and that this caused injury to William's right thigh. Simms knew that William was "restless" from a fever on Monday night, but "popped" him anyway as a form of discipline to make him sleep. Simms did not regard this "discipline" of a fourteen-month-old child as "excessive."

### D. Simms' relationship with William.

Simms also presented testimony designed to show that, in disciplining William, he was acting *in loco parentis*. He testified that he met William's mother in February 2000, that she became his fiancée in July of that year, and that he considered William to be his son or stepson. He claimed that from the time when he had met Ms. Calloway, he had on occasion provided food, clothes, shoes, diapers, bottles, and "anything else that [William] needed...." Simms testified that he accepted this financial burden even while Ms. Calloway was unemployed. He took William to the park or to the mall, and he accompanied the boy and his mother on similar outings. Simms stated that he had seen William's mother and grandmother discipline William in the same manner that Simms did, and he claimed that the mother had been present on occasions when he disciplined the boy.

At the time of the events that led to his prosecution, however, Simms was still living with his parents, while Ms. Calloway

and William lived together in a separate household. Indeed, Simms answered in the affirmative when his attorney asked him, "Did you *babysit* [William] on occasion?" (Emphasis added.) Simms estimated that before November 2000, he "*babysat*" or "*watched*" William four or five times when the boy's mother had "to go to work or [when] it would be inconvenient for her to handle him." (Emphasis added.) By Simms' own account, the occasions on which he looked after William had been sporadic and—given that he had known Ms. Calloway since the previous February—quite infrequent, once every couple of months.

### E. The trial judge's rulings.

The trial judge refused Simms' request that the jury be instructed on the defense of "reasonable parental discipline,"[3] concluding as a matter of law that Simms was not acting *in loco parentis*. Putting the matter in a nutshell, the judge stated that Simms was just "babysitting" and "was not keeping this kid the whole time or taking care of this kid. That was his mother's responsibility."

As previously noted, the jury convicted Simms of simple assault only. Simms filed a motion for a new trial, which the trial judge denied in a written order. In his order, the judge wrote, *inter alia*, that Simms "did not offer any evidence other than a conclusory naked assertion that he was acting *in loco parentis*." After discussing *Martin v. United States*, 452 A.2d 360 (D.C.1982), and *Fuller v. Fuller*, 247

---

3. Specifically, Simms' attorney had asked the trial judge to give Redbook Instruction No. 4.06, which provides, in pertinent part, as follows:

> The parent of a minor child is justified in using a reasonable amount of force upon the child for the purpose of safeguarding or promoting the child's welfare, including the prevention or punishment of his/her mis-

conduct. Thus, the parent may punish the child for wrongdoing and not be guilty of assault (1) if the punishment is inflicted out of a genuine effort to correct the child, and (2) if the punishment thus inflicted is not excessive in view of all the circumstances ....

See CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA (4th ed. 2002).

A.2d 767 (D.C.1968), *aff'd*, 135 U.S.App. D.C. 353, 418 F.2d 1189 (1969) (per curiam), the judge continued:

> Here, the Defendant had certainly not put himself in the position of a lawful parent. He had occasionally watched the child over the past few months, but had not assumed any other duties or obligations beyond babysitting and duties incidental thereto. As the Government notes, when the child was injured the Defendant did not take any action on his own. Defendant simply called the child's mother.[4] It was the mother, not Defendant, who then left her job, took a cab across town, evaluated the child's condition, then called an ambulance for her son. Neither Defendant's testimony, nor his actions, present any evidence that Defendant even attempted to place himself in the position of a lawful parent notwithstanding his stating that he was the father or considered himself thus. This evidence, if you can describe it as such, is no more than a conclusory statement of his relationship with the child or an emotional feeling of fatherhood on his part without any evidentiary basis in fact.

The judge sentenced Simms to imprisonment for 180 days, but suspended execution of the sentence, placed Simms on supervised probation for two years, and ordered him to perform 100 hours of community service, to complete high school or its equivalent, and to obtain counseling.

## II.

### LEGAL ANALYSIS

■ Simms contends on appeal that the trial judge erred by refusing to instruct the jury on the defense of reasonable parental discipline. We do not agree, for in our view, the record did not warrant such an instruction.

■ A "defendant in a criminal case is entitled to an instruction on any issue 'fairly raised by the evidence.'" *Martin*, 452 A.2d at 362. "A special instruction is warranted when there is evidence of special facts sustaining a rational defensive theory." *Id.* Simms was "entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Outlaw v. United States*, 806 A.2d 1192, 1200 (D.C.2002) (quoting *Jackson v. United States*, 645 A.2d 1099, 1102 (D.C.1994)) (citation and internal quotation marks omitted). As this court explained in *Martin*, 452 A.2d at 362,

> [i]n order to be entitled to a jury instruction on the right of one acting *in loco parentis* to use reasonable disciplinary measures, two issues must be fairly raised by the evidence. First, there must be evidence that the aggressor stood *in loco parentis* to the child, and second, there must be evidence upon which a jury could conclude that reasonable discipline was used under the circumstances.

(Citations omitted); *accord, Newby v. United States*, 797 A.2d 1233, 1241 (D.C. 2002). In determining whether the requested defense instruction was properly denied, we must review the record in the light most favorable to Simms. *Adams v. United States*, 558 A.2d 348, 349 (D.C. 1989). An instruction on a proposed defense is not required, however, where in order to accept that defense, the jury would have to engage in "bizarre reconstructions of the evidence." *Id.* (quoting

---

4. Simms claimed, however, that he had made a sling for the baby's arm and had encouraged Ms. Calloway to summon the ambulance.

*Wood v. United States,* 472 A.2d 408, 410 (D.C.1984)).

The Latin phrase *"in loco parentis,"* literally translated, means "in the place of a parent." We have described the concept as follows:

The term *"in loco parentis,"* according to its generally accepted common law meaning, refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to legal adoption. It embodies the two ideas of assuming the parental status and discharging the parental duties.

*Fuller,* 247 A.2d at 770 (quoting *Niewiadomski v. United States,* 159 F.2d 683, 686 (6th Cir.), *cert. denied,* 331 U.S. 850, 67 S.Ct. 1730, 91 L.Ed. 1859 (1947)); *accord, Martin,* 452 A.2d at 362.[5] "This relationship involves more than a duty to aid and assist, more than a feeling of kindness,

affection or generosity." *Fuller,* 247 A.2d at 770; *Niewiadomski,* 159 F.2d at 686.[6]

The principles underlying our cases discussing the status of *in loco parentis* are consistent with the law in other jurisdictions. In *Commonwealth v. O'Connor,* 407 Mass. 663, 555 N.E.2d 865 (1990), the Supreme Judicial Court of Massachusetts addressed the "disciplinary privilege" granted to one standing *in loco parentis* persuasively and in some detail:

Of course, as a predicate to establishing such a disciplinary privilege, a person who is not a parent must prove that he or she stands *in loco parentis* to the child. Annot., 89 A.L.R.2d, *supra* at 399 n. 1.[7] To be entitled to the legal status of one *in loco parentis,* a person must assume all the duties and obligations of a parent toward the child. *Martin v. United States, supra,* [452 A.2d] at 362. *Nova Univ., Inc. v. Wagner,* 491 So.2d 1116, 1118 n. 2 (Fla.1986). *Peterson v. Kabrich,* 213 Mont. 401, 408, 691 P.2d

---

**5.** In the *Fuller* case, the question was whether the defendant was liable for child support on the theory that he was *in loco parentis* vis-a-vis the child. In *Martin,* the defendant asserted, as Simms claims here, that he had the right to discipline the victim because he stood *in loco parentis* towards him. Although the cases thus arose in different contexts, the court in *Martin* adopted the definition of the term articulated in *Fuller.*

**6.** This court further stated in *Fuller,* 247 A.2d at 770, and reiterated in *Martin,* 452 A.2d at 362, that the status of *"in loco parentis"* arises only "when one is willing to assume *all* the obligations and to receive *all* the benefits associated with one standing as a natural parent to a child." (Emphasis added in *Martin* ). The trial judge quoted this language in his opinion denying Simms' motion for a new trial. Simms argues, not implausibly, that this sentence was not necessary to the court's decision either in *Fuller* or in *Martin.* He points out that the quoted language, read literally, "would preclude such a finding for a step-parent, for example, when the [biological] parent continues to assume 'some' obli-

gations and receive 'some' benefits." There may indeed be situations in which the language to which Simms objects might be too broad, *e.g.,* in the example suggested by Simms.

We have no occasion, on this record, to consider whether, during the thirty-five years that have elapsed since *Fuller* was decided, there have been developments in the numerous kinds of arrangements that characterize modern child-rearing which might require some revision of the "all or nothing" approach articulated in that decision and reiterated in *Martin.* These concerns have no application here; Simms demonstrably fails to qualify for *in loco parentis* status under the quoted language in *Fuller* preceding the phrasing with which Simms takes issue, as well as under the additional authorities cited *infra.*

**7.** The court's reference is to Annotation, *Criminal Liability for Excessive or Improper Punishment Inflicted on Child by Parent, Teacher, or One In Loco Parentis,* 89 A.L.R.2d 396 (1963).

1360 (1984). *Kransky v. Glen Alden Coal Co.,* 354 Pa. 425, 428, 47 A.2d 645 (1946). *Gribble v. Gribble,* 583 P.2d 64, 66 (Utah 1978). The key factors to a threshold showing of *in loco parentis* status are the intent to take over the position of parent, and the discharge of support and maintenance responsibilities toward the child. *Klein v. Sarubin,* 324 Pa.Super. 363, 367–368, 471 A.2d 881 (1984). *State v. Pittard,* [45 N.C.App. 701, 703, 263 S.E.2d 809 (1980)]. *Fevig v. Fevig,* 90 N.M. 51, 53, 559 P.2d 839 (1977). *State ex rel. Gilroy v. Superior Court,* 37 Wash.2d 926, 933, 226 P.2d 882 (1951). *McManus v. Hinney,* 35 Wis.2d 433, 437, 151 N.W.2d 44 (1967).

Intent to replace a natural parent is never to be lightly inferred. *In re Appeal of Fowler,* 130 Vt. 176, 179–180, 288 A.2d 463 (1972). For example, an *in loco parentis* relationship does not arise merely because someone in a position of a stepparent has taken a child into his or her home and cares for the child. *Klein v. Sarubin, supra,* 324 Pa.Super. at 368, 471 A.2d 881. *In re Appeal of Fowler, supra,* 130 Vt. at 181, 288 A.2d 463. *Matter of Montell,* 54 Wash.App. 708, 712, 775 P.2d 976 (1989). An impermanent living arrangement shared between the adult and the child has been held to demand even greater affirmative indication of the adult's intention to assume parental responsibilities toward the child to raise a jury question of his *in loco parentis* status. *Kransky v. Glen Alden Coal Co., supra* 354 Pa. at 429, 47 A.2d 645.

*Id.* at 868–69.

In the present case, no impartial trier of fact could rationally find that Simms "put himself in the situation of a lawful parent"

or that he "assum[ed] the obligations incident to the parental relation without going through the formalities necessary to legal adoption." *Fuller,* 247 A.2d at 770. Indeed, the difference between Simms' status and that of a parent consists of far more than "going through the formalities." As of November 1990, Simms had never lived in the same household as William, and he had never provided William with a home. *See O'Connor,* 555 N.E.2d at 868–69 (explaining that the lack of a permanent living arrangement between an adult claiming *in loco parentis* status and the child makes proof of the intent to replace a natural parent, which, in any event, is "never to be lightly inferred," even more difficult). "It has been said that when a person takes a child not his own *into his custody* as a member of his own family, this constitutes the clearest evidence of consent to stand *in loco parentis.*" *Bowers v. Maryland,* 38 Md.App. 21, 379 A.2d 748, 753 (Spec.App.1977) (emphasis added) (quoting 59 AM. JUR. 2d *Parent and Child* § 88).[8] Indeed, although Simms had met William's mother in February 2000, and although he claimed that he had regarded William as his son or stepson from the beginning of his relationship with her, Simms had only "watched" or "babysat" the child four or five times prior to the events in November 2000 that resulted in his prosecution and conviction. This hardly amounted to a *de facto* parent-child relationship, lacking only the formalities. Indeed, the fact that Simms was looking after William at the time of the offense was itself fortuitous; because he had been injured in an automobile accident, Simms was temporarily unable to go to work, so that he was temporarily available to care

---

8. But even "the fact that a child was a part of a man's household and received its support entirely from him is not enough to establish a

*in loco parentis* relationship ...." *Id.* In this case, Simms did not make William a part of his household at all.

for William while the boy's mother was at her job.

Simms also testified that he had often purchased food and other necessities for William. Assuming, as we must for present purposes, that this testimony was accurate,[9] it was insufficient, independently or together with the other evidence of record, to establish that Simms stood *in loco parentis,* a "relationship [which] involves more than a duty to aid and assist, more than a feeling of kindness, affection or generosity." *Fuller,* 247 A.2d at 770. A kindly uncle, or, for that matter, an ardent suitor, might have performed these generous acts without becoming the substantial equivalent of a parent to William.

Simms argues, correctly, that the status of *in loco parentis* turns in substantial part on intent of the person claiming it. *See Cooley v. Washington,* 136 A.2d 583, 585 (D.C.1957). He asserts that he considered William to be his son or stepson, and that it was his intention to treat the boy as his own child. The difficulty with Simms' position is that it equates the hoped for future with the markedly different present. According to Simms, William's mother was his fiancée. He presumably intended, at some future time, to marry her and, together with her, to provide a home for her son. Once he had provided the home and lived in it with William and his mother, Simms might achieve the kind of continuous, day-to-day relationship with William which could reasonably be viewed as akin to that of father and son. But in November 2000, none of this had happened, and a proclamation of future intent could not make it so.[10]

Finally, Simms' claim in this case rests solely on his assertion that the trial judge erred by refusing to instruct the jury with respect to the right of a parent to use a reasonable amount of force to discipline his or her child. Simms asserts that he was entitled to this instruction because he stood *in loco parentis* vis-a-vis William. No issue has been raised in this case, either in the trial court or in this court, regarding whether a care giver not *in loco parentis* has a derivative or other right, under some circumstances, to impose any discipline upon a child.[11] We therefore express no opinion on this subject.

### III.

### CONCLUSION

For the foregoing reasons, Simms' conviction is

*Affirmed.*

---

9. For purposes of Simms' entitlement to the requested instruction, we view the record in the light most favorable to him. *Adams,* 558 A.2d at 349. William's mother did not testify for either party and thus provided no corroboration for Simms' account, but no corroboration was required.

10. *Byrd v. United States,* 705 A.2d 629 (D.C. 1997), provides no solace to Simms' position. In *Byrd,* the defendant was the stepfather of his wife's children, and had lived with them during his five year marriage to their mother, had acted as a parent to them. The question was whether the defendant remained *in loco parentis,* and was thus not prosecutable for kidnapping, under an exception for parents in the kidnapping statute. *Id.* at 631–33; *see* D.C.Code § 22–2101 (1996). The court ruled that a jury question was presented as to whether the defendant remained *in loco parentis,* but that, under all of the circumstances, the trial court error in ruling to the contrary was harmless. Nothing in the *Byrd* opinion bears on Simms' claim that he stood *in loco parentis* vis-a-vis William.

11. Simms' testimony that the discipline that he imposed was the same as that imposed by William's mother was offered solely to prove that he personally stood *in loco parentis* vis-a-vis William.