Pamela **FIELDS**, Appellant,

v.

Gary **MAYO**, et al., Appellees.

No. 06–FM–623.

District of Columbia Court of Appeals.

Argued Oct. 21, 2008.

Decided Oct. 29, 2009.

Peter C. Pfaffenroth, with whom Jeffrey T. Green was on the brief, for appellant.

Scott L. Cunningham, Guardian Ad Litem, filed a statement in lieu of brief, for A.W.

Before RUIZ and REID, Associate Judges, and STEADMAN, Senior Judge.

REID, Associate Judge:

Appellant, Pamela Fields, the maternal great aunt of A.W., a minor, appeals from the trial court's order granting "sole legal and physical custody of [A.W.] ... to [appellee,] Gary Mayo," A.W.'s biological father.[1] Ms. Fields contends, in part, that the case should be remanded to the trial court for consideration as to whether she should be recognized as a "de facto parent" under D.C.Code § 16–831.01 *et seq.*

1. Neither Mr. Mayo, nor appellee, K.W., A.W.'s biological mother, filed a brief in this matter.

(2008 Supp.), a statute enacted after the entry of the trial court's order in this case, and after the filing of her brief in this court. She maintains that the trial court committed error by improperly applying a presumption in favor of Mr. Mayo as a biological parent, and concomitantly, imposing on her, the de facto parent, the burden of establishing by clear and convincing evidence that custody of A.W. by Mr. Mayo "would be detrimental to [A.W.'s] best interests." She also complains that the trial court (1) ignored K.W.'s wishes and K.W.'s "fundamental interest regarding the custody of her son," and (2) failed to "give sufficient weight" to the recommendations of the guardian *ad litem.* Discerning neither prejudicial error nor abuse of discretion, we affirm the trial court's judgment.

## FACTUAL SUMMARY

This case began on August 12, 2003, when Mr. Mayo filed a complaint for permanent custody of his biological son, A.W. Mr. Mayo amended his complaint on October 8, 2003, and Ms. Fields, who then had had custody of A.W. for several years, lodged an answer and a counterclaim for custody. During a proceeding which extended over seven days, beginning on December 14, 2004 and ending on September 26, 2005, the trial court heard testimony from several witnesses, including Mr. Mayo, Ms. Fields, K.W., and A.W.'s teachers. A.W.'s guardian *ad litem* also shared his views with the court.

The trial court's factual findings show that A.W. was born in January 1995, to teenage parents (17 and 18 years old at the time). He spent the first year of his life with his father, in the home of Mr. Mayo's mother. During the following year and

several months, A.W. resided with his mother, K.W., in the southern part of the United States. As a result of K.W.'s request, Ms. Fields had custody of A.W., beginning in May 1997, and continuing to March 2006. Ms. Fields adopted A.W.'s sister in 2002, after the trial court found that K.W. had neglected her daughter. From May 1996 to 2000, Mr. Mayo had no contact with A.W. and provided virtually no financial support for A.W. Commencing in 2000, however, Mr. Mayo had regular contact with A.W. while the child was living with Ms. Fields, but other than the payment of two small sums of money in 2000 ($50 and $75), he did not financially support his son. However, the trial court found that "Mr. Mayo started becoming involved in [A.W.'s] education—regularly visiting [his] school, conferring with teachers, etc.—when [A.W.] was in 1st grade, and has been actively involved since." Ms. Fields and Mr. Mayo worked out a mutually agreeable visitation schedule, and the trial court determined that in the home of Mr. Mayo and his fiancee, A.W. "has his own bedroom and Mr. Mayo and his fiancee are able to give [A.W.] more personalized attention than he receives at Ms. Fields' home."

The trial court described the home of Ms. Fields and her husband as "a somewhat chaotic household." Ms. Fields cared for A.W., his younger brother and his sister on a full-time basis and her husband worked to provide financial support for the family.[2] In addition to A.W. and his siblings, the Fields' grandchildren and other relatives visited on a regular basis. Consequently, the trial court found that even "[t]hough [Ms.] Fields has been very involved in [A.W.'s] school life, she is not always able to, afford him individualized

---

**2.** Ms. Fields received $298.00 per month in TANF funds (Temporary Assistance for Needy Families) for A.W. and his brother.

attention in the home, due to the number of children in the home and other quasi-parental obligations ['there are always two or three children sharing a bedroom']."

The trial judge examined the hearing record and applied the statutory factors set forth in D.C.Code § 16–914(a)(3) (2008 Supp.) that are pertinent to a custody decision.[3] In deciding whether Mr. Mayo or Ms. Fields should be awarded permanent custody of A.W., the judge recognized that "[c]ustody claims between parents are subject to the preponderance of the evidence standard of proof." However, because the case involved Mr. Mayo as a biological parent and Ms. Fields as "a non-parent third party to whom a biological parent, who has been found to have neglected at least one of her children has thrown her proxy or support," the trial court invoked the "presumption that the best interests of a child are served by being in the custody of a biological parent, unless clear and convincing evidence demonstrates that such custody would be detrimental to the child's best interests." The court conclud-ed that Ms. Fields had not sustained her burden to overcome the presumption.

The trial court acknowledged (1) the guardian *ad litem's* position that the statutory factors were "evenly in balance but nonetheless ... that [A.W.'s] best interests would be served by continuing placement with Ms. Fields," and (2) the guardian *ad litem's* reservations about Mr. Mayo. In response, the trial judge declared:

> The Guardian's points are well taken, however the evidence in toto presented the Court with two households: one where [A.W.] has been 'treading water' barely staying afloat amongst several others doing the same; the other where the promise, which the Court finds to be borne out by the evidence, of individualized attention from a father who will take the time to help and guide [A.W.] as he grows up into a young man.

Furthermore, the trial court stated that its decision would not have been different if it had ignored the presumption in favor of Mr. Mayo and decided the case on a preponderance of the evidence standard:

---

**3.** D.C.Code § 16–914(a)(3) provides:

> (3) In determining the care and custody of a child, the best interest of the child shall be the primary consideration. To determine the best interest of the child, the court shall consider all relevant factors, including, but not limited to:
> (A) the wishes of the child as to his or her custodian, where practicable;
> (B) the wishes of the child's parent or parents as to the child's custody;
> (C) the interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may emotionally or psychologically affect the child's best interest;
> (D) the child's adjustment to his or her home, school, and community;
> (E) the mental and physical health of all individuals involved;
> (F) evidence of an intrafamily offense as defined in section 16–1001(5) [now § 16–1001(8)];

> (G) the capacity of the parents to communicate and reach shared decisions affecting the child's welfare;
> (H) the willingness of the parents to share custody;
> (I) the prior involvement of each parent in the child's life;
> (J) the potential disruption of the child's social and school life;
> (K) the geographic proximity of the parental homes as this relates to the practical considerations of the child's residential schedule;
> (L) the demands of parental employment;
> (M) the age and number of children;
> (N) the sincerity of each parent's request;
> (O) the parent's ability to financially support a joint custody arrangement;
> (P) the impact on Temporary Assistance for Needy Families, or Program on Work, Employment, and Responsibilities, and medical assistance; and
> (Q) the benefit to the parents.

[E]ven if Mr. Mayo and Ms. Fields were on an "even footing" arguing over the preponderance of the evidence, with the benefit of no presumption or heightened evidentiary burden, the facts of this case read through the statutory factors would nonetheless lead this Court to award custody to Mr. Mayo. This is not to ignore the contribution Ms. Fields has made to [A.W.] for the last seven years; it has been significant and at a time when no one else was available. [Ms.] Fields is to be commended for her efforts on behalf of [A.W.] and the Court will order liberal visitation in recognition of her efforts.

The trial court awarded "sole legal and physical custody of [A.W.] to [Mr.] Mayo," and left it to the parties to work out a "liberal visitation" schedule for Ms. Fields and A.W.

## ANALYSIS

Ms. Fields argues that the trial court erred by not recognizing that she is A.W.'s "de facto parent," and hence, the court "fail[ed] to accord proper weight to her request for custody." Furthermore, she claims that "[b]y simply characterizing this case as 'effectively an action between a parent, Mr. Mayo, and a non-parent, Ms. Fields,' the [trial court] improperly applied a presumption in favor only of [A.W.'s] biological father and incorrectly maintained that Ms. Fields had to prove by 'clear and convincing evidence' that custo-

dy with Mr. Mayo is not in [A.W.'s] best interests." On October 20, 2008, prior to oral argument in this case, Ms. Fields submitted a letter under D.C.App. R. 28(k) calling the court's attention to the fact that the Council of the District of Columbia had codified "de facto parental status." [4]

■ Under D.C. Law 17–21, the District of Columbia Safe and Stable Homes for Children Act of 2007, which became effective on September 20, 2007, after the trial court issued its March 2, 2006 findings and conclusions in this case, the District's legislature provided that a de facto parent "shall be deemed a parent" for the purpose of determining the legal and physical custody of a child.[5] D.C.Code § 16–831.03 provides, in pertinent part:

(a) A de facto parent may file a complaint for custody of a child or a motion to intervene in any existing action involving custody of the child.

(b) An individual who establishes that he or she is a de facto parent by clear and convincing evidence shall be deemed a parent for the purposes of §§ 16–911, 16–914, 16–914.01, and 16–916, and for the purposes of this chapter if a third party is seeking custody of the child of the de facto parent.

D.C.Code § 16–831.01(1) defines "de facto parent" as follows:

(1) "De facto parent" means an individual:

(A) Who:

**4.** A few of our pre–2007 cases use the term "de facto parent(s)" but without explication of the concept. *See Simms v. United States,* 867 A.2d 200, 206 (D.C.2005); *In re P.S.,* 797 A.2d 1219, 1224 (D.C.2001); *In re L.W.,* 613 A.2d 350, 354 (D.C.1992). The term has been used and explained in other jurisdictions. *See Philbrook v. Theriault,* 957 A.2d 74, 78–80 (Me.2008) (grandparents failed to establish that they were de facto parents); *In re Parentage of L.B.,* 155 Wash.2d 679, 122 P.3d 161, 165 (2005) (case remanded to determine

whether a female partner enjoyed the status of de facto parent); *Blixt v. Blixt,* 437 Mass. 649, 774 N.E.2d 1052, 1061 n. 15 (2002) (defining de facto parent).

**5.** For the legislative history of the Act, *see* COUNCIL OF THE DISTRICT OF COLUMBIA COMMITTEE ON HUMAN SERVICES, REPORT ON BILL 17–41, THE "SAFE AND STABLE HOMES FOR CHILDREN AND YOUTH ACT OF 2007."

(i) Lived with the child in the same household at the time of the child's birth or adoption by the child's parent;

(ii) Has taken on full and permanent responsibilities as the child's parent; and

(iii) Has held himself or herself out as the child's parent with the agreement of the child's parent or, if there are 2 parents, both parents; or

(B) Who:

(i) Has lived with the child in the same household for at least 10 of the 12 months immediately preceding the filing of the complaint or motion for custody;

(ii) Has formed a strong emotional bond with the child with the encouragement and intent of the child's parent that a parent-child relationship form between the child and the third party;

(iii) Has taken on full and permanent responsibilities as the child's parent; and

(iv) Has held himself or herself out as the child's parent with the agreement of the child's parent, or if there are 2 parents, both parents.

Assuming application of the statute to Ms. Fields,[6] arguably she would qualify as a "de facto parent" under D.C.Code § 16–831.01(1)(B) and § 16–831.03, even under a clear and convincing evidence standard (§ 16–831.03(b)). Contrary to the trial court's ruling, she would not have the burden of demonstrating by clear and convincing evidence that custody of A.W. by his biological father would be detrimental to A.W.'s best interests.

Since the trial court assumed that "even if Mr. Mayo and Ms. Fields were on an 'even footing' arguing over the preponderance of the evidence, with the benefit of no presumption or heightened evidentiary burden, the facts of this case read through the statutory factors would nonetheless lead this Court to award custody to Mr. Mayo," we see no prejudice to Ms. Fields traceable to the trial court's non-consideration of D.C. Law 17–21, assuming its application to this case. Thus, unlike our disposition in *In re K.R.*, *supra* note 6, we decline to remand this matter to the trial court for consideration of D.C. Law 17–21.

Second, Ms. Fields contends that the trial court "erred in ignoring [K.W.'s] fundamental interest regarding the custody of her son and in using a neglect adjudication to invalidate K.W.'s proxy in favor of M[ ]s. Fields without legal justification." During the hearing, K.W. expressed her view that "[she] and Ms. Fields should have joint custody of [A.W.]...." She acknowledged a past neglect case against her involving one of her other children [the child adopted by Ms. Fields]. While the trial court stated that K.W. "has been visiting with [A.W.] at Ms. Fields' house since he started living there in 1997," the court determined that "she has not spent much time with him and evidences little involvement in his school or social life."

■ "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary

---

**6.** *See K.R. v. C.N.*, 969 A.2d 257 (D.C.2009) (involving the biological father's challenge of the trial court's award of his child to the maternal aunt under D.C.Code § 16–831.02; indicating that D.C. Law 17–21 "did not ... include language addressing the question of whether this law should be applied retroac-

tively" and remanding the case to the trial court "for the trial court to determine whether jurisdiction is proper ... and, if so, to make a custody determination consistent with the standards set forth in D.C.Code § 16–831.01–.13 (2008 Supp.))."

custody of their child to the State." [7] But, a parent may "forfeit[ ] the right to direct the upbringing of [her child]." [8] Here, K.W. did not take the position that Ms. Fields alone should have custody of A.W. rather than Mr. Mayo. Instead, K.W. desired joint custody with Ms. Fields. But, the trial court implicitly found, and the record establishes, that K.W. had forfeited her right to parent A.W. by failing to spend much time with him, and by having virtually no involvement in A.W.'s schooling or his social life; and similarly, had neglected her parental duties with respect to another of her children. Indeed, K.W. conceded that only two of her seven children resided with her. Considering the factual context in which the trial court viewed this case, that is, K.W.'s desire that she and Ms. Fields have joint custody of A.W. and K.W.'s lack of significant involvement in the development of A.W., we cannot agree that the trial court ignored K.W.'s fundamental liberty interest as a parent and her "proxy" in favor of Ms. Fields. K.W.'s liberty interest in designating (a) caretaker(s) for A.W. is not absolute and "must yield to [the child's] best interests and well-being." [9] The trial

court, properly exercising its discretion,[10] determined that custody by Mr. Mayo was in A.W.'s best interests, even though K.W. had entrusted Ms. Fields with custody of A.W., beginning in May 1997.

Finally, Ms. Fields maintains that the trial court "erred, as a matter of law, by failing to give sufficient weight or to respond adequately to guardian *ad litem* recommendations that were based on careful research and personal interactions with the parties." She asks us to reverse and remand this case because the trial court "substantially undervalued the guardian *ad litem's* recommendations and neglected to explain its reasoning in departing from the guardian's expert conclusions about what would serve [A.W.'s] best interests."

In fact, the trial court did consider the guardian *ad litem's* comments during the hearing, and explicitly considered his opinion that (as the trial court articulated it), although "the evidence on the statutory factors [was] evenly in balance, . . . A.W.'s best interests would be served by continuing placement with Ms. Fields," in part because of A.W.'s relationship with his brother and sister in the Fields' home.[11]

7. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

8. *See In re T.J.,* 666 A.2d 1, 14 (D.C.1995) (citations omitted).

9. *See In re K.I.,* 735 A.2d 448, 454 (D.C.1999).

10. *See Johnson v. United States,* 398 A.2d 354 (D.C.1979).

11. In assessing one of the D.C.Code § 16–914 statutory factors concerning the best interests of the child, § 16–914(a)(3)(C), "the interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may emotionally or psychologically affect the child's best interest," the trial court stated:

    Ms. Fields is the most consistent guardian [A.W.] has known; she provides a home life

for him which includes day-to-day interaction with extended family including [his brother], his sister whom [Ms.] Fields has adopted, and [A.W.'s] mother, on the occasions that she comes to visit. [A.W.'s] interaction and interrelationships with Ms. Fields and the other members of her household are quite significant.

[A.W.'s] interaction with his father in recent years has also been significant: in weekend and summer visitations, he has become acquainted and interrelated with his father's side of the family and fiancee. The relationships he has developed with these relatives and others who emotionally and psychologically affect him are important.

Placing [A.W.] with Mr. Mayo would deprive him to some extent of the relationships he has forged in the Fields' home; leaving him with Ms. Fields would leave, at

The court also mentioned the guardian's reservations about Mr. Mayo based on his failure to search for A.W. "in earnest" and, after he eventually found him, his failure to support A.W. financially, an unexplained failure which "concern[ed] the [c]ourt." [12] On the last day of the hearing, the trial court gave the guardian *ad litem* an opportunity to voice his opinion, and the guardian stated, in part:

I think that probably Mr. Mayo is better equipped to assist [A.W.] in his educational, ... intellectual development, and I think Mr. Mayo provides a fine home. However, ... balanced against ... that fine home, that fine home is miles away from that [which A.W.] has had over the last seven to nine years. From the human contact ... that he has developed and from the family to friends and neighbors and his brother, ... whom he has ... lived his life with so far, ... this is not a case involving [A.W.'s brother] and [A.W.] moving to a new home. This is a case involving [A.W.] moving to a new home and being separated from his brother.

Mr. Mayo has not shown a passionate and sincere interest in [A.W.]. He may well have but ... to my mind, he has not shown it. And this comes from his failure to undertake an earnest and exhaustive search for the child.... His

failure to actively provide support during pendency of this litigation, attending to [A.W.'s] education, and certainly, there have been instances where Mr. Mayo has participated.., but it hasn't been consistent.... I like Mr. Mayo, I think he is a respectable man, I just did not see the sincerity of interest that is required.... So my final view is that the best interest of [A.W.] is that he remain in a stable environment with his family and with a caregiver that has shown through her actions, a stable and passionate and sincere interest in the consistent upbringing of the child.

D.C.Code § 16–918(b) states: "In any proceeding wherein the custody of a child is in question, the court may appoint a disinterested attorney to appear on behalf of the child and represent his best interests." The August 2004 order appointing Mr. Cunningham to serve as A.W.'s guardian *ad litem* "authorized [him] to obtain records and information ..., and to speak with any person with knowledge relevant to the best interests of the child ..., [and ordered him to] submit a written status report to the Court by September 16, 2004." It appears that Mr. Cunningham's role was that of an advocate for A.W. rather than that of a neutral factfinder, since he recommended a particular disposition to the trial court.[13]

---

best, strained his relationship with his father and that side of the family.

12. Scott Cunningham, A.W.'s guardian *ad litem*, submitted a report to the trial court on September 17, 2004, prior to the beginning of the hearing. The report revealed that A.W. resided with Ms. Fields and her husband, and his two half siblings, P.W. and S.W. In addition, three of the Fields's grandchildren stayed in the home. Mr. Cunningham's initial impression was that A.W.'s "current placement with Ms. Fields provides him with a stable environment, in which he is surrounded by people who care for him." Mr. Cunningham was "a bit concerned about

[A.W.'s] educational development" and "about whether Mrs. Fields has enough time to spend one-on-one with [A.W.], helping him with his reading." He commented that K.W. "does not appear to play any significant role in [A.W.'s] life."

13. We enunciated the distinction between a guardian *ad litem* as a neutral factfinder and as an advocate in *S.S. v. D.M.*, 597 A.2d 870 (D.C.1991):

As neutral factfinder, the attorney's duties are to investigate the details of the case and to prepare a report summarizing the relevant facts for the presiding judge; as fact-

■ As an advocate for the child, the position taken by the guardian *ad litem* can, in appropriate circumstances, serve as an inference of a child's preference.[14] Here, however, such an inference cannot reasonably be drawn. Mr. Cunningham informed the trial court that A.W. did have a "view" of the situation. But he stated that A.W. "[was] not really conscious of what was going on." Therefore, Mr. Cunningham "[did not] find [A.W.'s view] very probative," or "terribly probative." In light of Mr. Cunningham's assessment, the trial court left it to the parties to request that the court interview A.W., and the trial judge indicated that he would conduct the interview in his chambers upon request. An examination of the entire transcript of the proceedings reveals that no one asked the trial court to interview A.W. Hence, the court did not receive any first-hand indication of A.W.'s preference. Moreover, Mr. Cunningham's assessment that A.W.'s view was "not terribly probative" or "very probative" did not lead to a strong, perhaps not even a reasonable, inference, that Mr. Cunningham's recommended disposition—that A.W. remain with Ms. Fields—reflected A.W.'s actual preference.

■ "[I]t is without question ... that in any child custody case the controlling consideration is the best interest and welfare of the child[,][and][t]he determination of the best interest and welfare of the child ... [is] entrusted to the sound discretion of the trial court."[15] Here, the trial court undoubtedly heard the guardian *ad litem's* advocacy position on behalf of A.W., took it into consideration, and after studying the record, exercised its discretion to choose between two suitable homes for A.W., and decided (and explained) that it was in A.W.'s best interests to award legal and physical custody of A.W. to his biological father, and to grant Ms. Fields liberal visitation rights. Under the circumstances of this particular case, we are satisfied that the trial court did not abuse its discretion.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

finder, the attorney does not recommend a particular disposition. As advocate, the attorney forms an opinion, either in consultation with the child or based on his or her own analysis, about the disposition which would promote the child's best interests and advocates that position before the court.
*Id.* at 875.

**14.** *See, e.g., In re J.L. & R.L.,* 884 A.2d 1072, 1079–80 (D.C.2005) (discussing how the testimony of two social workers made known the children's opinion in an adoption proceeding

and stating that: "Given that the guardian ad litem is appointed to represent the children's interests, ... it is reasonable to infer from his position [in support of the petition] that the children prefer to be adopted...." (Citation omitted)); D.C.Code 16–914(a)(3)(A) (requiring the judge to take into account "the wishes of the child as to his or her custodian, wherever practicable").

**15.** *Utley v. Utley,* 364 A.2d 1167, 1170 (D.C. 1976) (citations omitted); *see also Spires v. Spires,* 743 A.2d 186, 190 (D.C.1999).