IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 27, 2012

**STATE OF TENNESSEE v. HERBERT B. WARD**

**Appeal from the Circuit Court for Blount County**
**No. C-18219, C-18935      David R. Duggan, Judge**

**No. E2011-02020-CCA-R3-CD - Filed January 17, 2014**

The Defendant, Herbert B. Ward, was convicted by a Blount County Circuit Court jury of especially aggravated kidnapping, aggravated kidnapping, and domestic assault. See T.C.A. §§ 39-13-305; 39-13-304; 39-13-111. He received a seventeen-year sentence for especially aggravated kidnapping, a nine-year sentence for aggravated kidnapping, and an eleven-month, twenty-nine-day sentence for domestic assault, all to be served concurrently for an effective seventeen-year sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to sustain his conviction for aggravated kidnapping of his wife and (2) the evidence is insufficient to sustain his conviction for especially aggravated kidnapping of his eleven-year-old daughter. The State contends that with regard to the kidnapping convictions, the trial court did not instruct the jury in accord with State v. White, 362 S.W.3d 559 (Tenn. 2012), but that the error was harmless beyond a reasonable doubt. We vacate the especially aggravated kidnapping conviction and dismiss the charge. We reverse the aggravated kidnapping conviction and remand for a new trial. We affirm the domestic assault conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Vacated in Part; Reversed in Part; Affirmed in Part; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Charles A. Carpenter, Maryville, Tennessee, for the appellant, Herbert B. Ward.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Senior Counsel; Michael L. Flynn, District Attorney General; and Ellen Berez, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

At the trial, Alcoa Police Officer Matt Caldwell testified that he responded to assist Officer Brett Romer with an unrelated call at Grayson Apartments around 8:00 or 8:30 p.m. on May 31, 2009. He said that while he was speaking to a person involved in the unrelated call, he noticed K.W., the Defendant's daughter, leave her apartment and move closer to him. He said she started crying "uncontrollably," ran up to him, and wrapped her arms around his leg. He said he saw the Defendant leave the breezeway of the apartment building in "an aggressive manner" and walk toward him and K.W. He stated that K.W. was upset and that as the Defendant approached, K.W. said, "Please don't let him hurt us anymore."

Officer Caldwell testified that Officer Romer stepped between K.W. and the approaching Defendant and placed his hand on the Defendant's chest to stop his advancement. Officer Caldwell said that he convinced K.W. to release his leg and that when he approached the Defendant, he immediately smelled a "very strong odor of an alcoholic beverage." He said the Defendant was yelling profanities and suggesting the officers not listen to K.W. because she was lying. He stated that the Defendant said, "Do not listen to her; she's just a lying b----." He said that the Defendant walked aggressively toward K.W. with "a blank angry stare" and that he and Officer Romer detained the Defendant by placing him in handcuffs to assess and gain control of the situation. He said he felt that he, Officer Romer, and K.W. might have been in danger because the Defendant had recently left his apartment, had not been searched, was using foul language, and was causing a disturbance.

Officer Caldwell testified that after the Defendant was detained, he walked the Defendant to his patrol car and that the Defendant kept saying, "[S]he's a lying bitch or whore." He said he asked the Defendant if he was speaking of K.W., and the Defendant responded that K.W. was his daughter but that he was talking about his wife. Officer Caldwell said that he requested another officer respond to the scene and that he stayed with the Defendant until the other officer arrived. He said that "DUI tests" were used to assess someone suspected of driving under the influence and that he used subjective criteria to determine if someone was under the influence of alcohol. He determined that the Defendant was under the influence of alcohol based on the Defendant's demeanor, language, and smell.

Officer Caldwell testified that Officer Romer interviewed the Defendant's wife. He said he spoke with K.W. and asked her what happened. K.W. told him that she was inside the apartment, that the Defendant was drinking, and that he hurt her and Ms. Ward. K.W. told Officer Caldwell that the Defendant choked and pushed Ms. Ward down while Ms. Ward was holding K.W.'s little sister and that he threatened to kill them all. K.W. said that when she attempted to leave, the Defendant threw her into the door, hurting her ribs and

chest. Officer Caldwell said a female officer arrived later to inspect K.W. but did not find any physical injuries.

Officer Caldwell testified that he saw Jody Ward, the Defendant's wife and K.W.'s mother, several times during the investigation that night. He said that the first time he saw Ms. Ward, he noticed she was wearing a white t-shirt with a "stretched-out" collar with what appeared to be dried blood on the collar. He said K.W. told him that Ms. Ward would probably try to "cover" for the Defendant and that she was scared of her father. K.W. told him that the assault and kidnapping occurred throughout the afternoon and that they were not allowed to leave the apartment. Officer Caldwell stated that K.W. said the girls were having a "camp out" when the Defendant pushed Ms. Ward into the tent set up in the bedroom. K.W. told him that Ms. Ward was holding K.W.'s little sister when she was pushed down and fell into the tent, damaging part of it.

On cross-examination, Officer Caldwell testified that he did not prepare a report about the incident but that he made notes and used those to prepare for the trial. He said that he was trained in detecting if someone was under the influence of drugs or intoxicants but that he had not completed tests to determine if the Defendant was intoxicated. He said the Defendant did not endanger other persons or property because he did not have an opportunity after the officers quickly detained him. He said no injuries were found on K.W. related to the incident. Officer Caldwell said that when K.W. asked him not to let the Defendant hurt them anymore, she spoke at a normal volume but that her tone was very upset. He agreed that he was not in the apartment when the incident occurred and that he did not have any first-hand knowledge of the incident.

Officer Caldwell testified that he did not take Ms. Ward's shirt into evidence but that it was photographed. He agreed it could not be determined whether the stain was blood by looking at the photograph. He said that he observed the damaged tent when he was at the scene, that one of the poles was bent, and that the tent was collapsed. He said he observed bruising on Ms. Ward.

Alcoa Police Officer Brett Romer testified that he was responding to an unrelated call in Grayson Apartments when he first encountered K.W. and that he first saw K.W. when she grabbed Officer Caldwell's leg. He stated that K.W. was extremely distraught and that she said, "[D]on't let him hurt us anymore." He said that he saw K.W. looking at something behind him and that he turned around and saw the Defendant coming from the apartment toward him in a "fixated trance." He heard the Defendant say, "Don't listen to her. She's lying." He said that the Defendant was "fixated" on K.W., that he put his hand on the Defendant's chest to stop him, and that he detained the Defendant. He said Officer Caldwell took the Defendant away to separate the parties and diffuse the situation as quickly as

possible. He said that there was a strong odor of alcohol about the Defendant and that he thought K.W. was in danger.

Officer Romer testified that K.W. told him the Defendant choked Ms. Ward and pushed Ms. Ward into the tent while she was holding K.W.'s sister. K.W. told Officer Romer that the Defendant would not allow them to leave the apartment and took control of the house keys to prevent K.W. or Ms. Ward locking him outside. K.W. stated that they were not given access to a telephone and that the Defendant told Ms. Ward he would drag her out of the tent and beat her if she did not come out and talk to him. K.W. told Officer Romer that Ms. Ward cut the window screen to allow K.W. to climb out because the Defendant would not let them leave the apartment.

Officer Romer testified that he met Ms. Ward in the doorway of her apartment and that he immediately noticed red marks on the left side of her throat. He said that Ms. Ward was "extremely uncooperative" and that she wanted the Defendant to come back to the apartment to "sleep it off." He said that the only way he could get Ms. Ward to give him information about the case was to try to confirm what K.W. said. He said that her only response was, "[K.W.] would never lie," and that Ms. Ward's voice became "scratchier" as the evening progressed.

Officer Romer testified that he was at the scene for five and one-half to six and one-half hours and that when he left, he went to the magistrate's office to obtain the warrants. He said that after the warrants were issued, he returned to his office and wrote his report. He said he heard the Defendant yelling about a "paranoid schizophrenic wife or paranoid wife, or something to that effect." He said that K.W. told him the Defendant was her father and that she remained upset throughout the night. He said that he interviewed Ms. Ward the day after the incident in the interview room at the police station and that the interview was recorded.

On cross-examination, Officer Romer testified that he thought K.W. was in danger because the Defendant had an "aggressive stature" and K.W. said, "Don't let him hurt us anymore." He said that in his opinion, K.W. was not exaggerating. He said that he was trained to detect intoxication and that he did not perform field sobriety tests on the Defendant because he only used those tests on people suspected of driving under the influence. He said Ms. Ward was uncooperative and agreed he may have believed she was uncooperative because he expected answers different than those she gave. He stated that he credited what K.W. said. He said that his supervisor called the Department of Children's Services (DCS) and that DCS took the children from the home that night. He said that he obtained warrants for the Defendant for domestic violence with aggravated assault, especially aggravated kidnapping, child abuse with aggravated assault, child abuse with simple assault, and public

intoxication but that at the preliminary hearing, all the charges were dismissed except public intoxication. He stated that he was the officer in charge of this case and denied that any forensic testing was done.

On redirect examination, Officer Romer testified that K.W. was not present at the preliminary hearing, although she was subpoenaed through Ms. Ward. He said that K.W.'s testimony was critical and that Ms. Ward was uncooperative during her testimony at the preliminary hearing. He said that Ms. Ward would have been cooperative at the scene if she had answered his questions.

K.W., the Defendant's daughter, testified that she was eleven years old at the time of the incident. She said that earlier on the day of the incident, she was roller skating, that the Defendant was outside drinking with his friends, and that her mother was inside with K.W.'s younger sister. She said that she asked her mother if she could go to a friend's house. Her mother asked the Defendant, but the Defendant would not allow K.W. to go.

K.W. testified that the family was inside that afternoon and that the Defendant was "drunk-er." She said the Defendant was mean and yelled when he was drunk. She said that the Defendant yelled at her and her mother that afternoon and that he would not let either of them leave the apartment. She said that when she tried to leave to play outside, the Defendant "pulled [her] back against the door," would not let her go, and locked the door behind her. When asked if it was a gentle or rough "pull," K.W. said that it was a "medium" pull and that it did "not really" hurt but scared her. She said that after he pulled her into the door, the Defendant took the apartment keys and telephone from her mother and sent them both to a bedroom.

K.W. testified that she set up a tent in her room because she wanted to go camping but could not go. She said she, her mother, and her sister were going to sleep in the tent. She said the Defendant pushed her mother when she was holding K.W.'s younger sister, causing her mother to fall into the tent and damage it. She said that while they were in the bedroom, the Defendant told her mother to leave the girls in the bedroom and come to the living room or he was going to kill her. She said her mother was scared and crying.

K.W. testified that from her bedroom window, she saw the police in front of her apartment building and that her mother was next to the window. She said she went to the living room with the Defendant and apologized because she did not want him to hurt them. She said that the window in the bedroom "cracked" because her mother was trying to open it and that the Defendant ran to the bedroom because he heard the window. She unlocked the front door and ran outside to the police. She said that when she was outside, she ran to the police, bent behind Officer Caldwell, held his leg, and said, "[D]on't let him hurt me

-5-

anymore." She said she felt she was in danger and was terrified when the Defendant came from the apartment toward her.

On cross-examination, K.W. testified that she did not see the Defendant take the keys and telephone but that her mother told her he did. She said her mother told her that the Defendant would not let her go to her friend's house. She stated that the incident started after she was told she could not go to her friend's house but that she did not say anything disrespectful to the Defendant to make him ground her. She said that she went outside to skate after the telephone call to her friend's mother and that the Defendant pulled her into the door. She said the Defendant yelled at her mother, although she did not remember what he said. She said that she only tried to leave the apartment once, which was when the Defendant pulled her back into the door. She said she did not see her mother attempt to leave.

K.W. testified that she did not have a normal relationship with the Defendant before this incident and did not speak to him. She agreed that the Defendant did not live with her and her mother all the time, that things were better when he was not there, and that she had more freedom when he was not there. She said she did not know there was a "scuffle or something" happening in the apartment complex until she saw the police. She stated that she saw the police from the bedroom window but that she could not see them from the living room because the blinds were closed. She said the police drove into the apartment complex without their sirens. She denied telling anyone that she lied about what occurred during the incident or that the incident did not occur.

Jody Ward, the Defendant's wife and K.W.'s mother, testified that earlier on the day on the incident, she was inside, that K.W. was rollerblading, and that the Defendant was outside playing with the children and talking to the neighbors. She said the Defendant had a drink. She said that K.W. wanted to go to a friend's house but that she and the Defendant did not allow K.W. to go. She said K.W. continued rollerblading. She said the Defendant was upset about the conversation he had with the mother of K.W.'s friend about K.W.'s going over to play.

Ms. Ward testified that she was going to camp with the girls in the bedroom but that she and the Defendant had a "disagreement." She stated that the Defendant grabbed her neck causing "light" bruises and that she "probably smacked him or something" to get him to stop choking her. She said that on the day of the incident, her cell phone did not have minutes left to use and that if she wanted to use a telephone, she could have gone to the neighbors' apartment. She said that the Defendant did not keep the telephone from her and that he kept the keys to prevent her locking him outside the apartment. Ms. Ward said she planned to have K.W. climb out the window, go to the neighbors, and call her mother. She said she did

not want K.W. to go to the front door because she did not want to fight with the Defendant anymore. She said that she could have left anytime she wanted but that she did not want to argue with the Defendant. She said the Defendant wanted her to come into the living room with him. She did not remember most of the statements she made during her interview with Officer Romer.

In an excerpt from Ms. Ward's interview with Officer Romer that was played for the jury, Ms. Ward said that when the Defendant came into the bedroom to make her close the window, "that's when [K.W.] made her escape." She said she planned to go out the window rather than the front door because the Defendant would not let her go out the front door. She said she did not want to attempt to use the front door because she knew the Defendant was not going to let them. In a letter that the Defendant wrote to Ms. Ward, the Defendant said:

> I've got court on the 11th at 9:00 a.m. Jody, you have got to be there to testify for me and say that you were just mad at me, that I did not touch you in any way, that I did not and have never hurt my kids, and that I am a great dad. Tell [K.W.] the same thing. . . . So, Jody, I don't care what you have to do or how many people you have to talk to get this stopped, dropped, thrown out, do it, please. . . . I seen a mark on your neck, Jody. I'm very sorry. Tell them that [K.W.'s younger sister] pinched you.

On cross-examination, Ms. Ward testified that she was not in a position to hear what K.W. said to the officers on the day of the incident. She said that although she told Officer Romer K.W. was a truthful child, K.W. was not. She said her children stayed with their grandmother on the night of the incident, not with her. She said that K.W. used a neighbor's telephone to call her friend about visiting and that K.W. had a cell phone that would dial 9-1-1 if needed. She stated K.W. "hated" her father. Ms. Ward stated that she never tried to leave the house, that the Defendant never tried to keep her from leaving, and that he did not have any weapons. She said anyone who could reach the door knob could open the door from the inside without the keys. She said the Defendant's pushing her into the tent did not break it. She said the Defendant grounded K.W. after his telephone conversation with the mother of K.W.'s friend. She said that on the day of the incident, she did not have a telephone in the apartment capable of making calls and that she could have gone through the living room and out the front door if she wanted. She said she remembered going to the interview with Officer Romer but did not remember the interview. She said she tried to cooperate and facilitate the investigation because she wanted to be reunited with her children.

John Cleveland, Jr., a neighbor of the Ward family, testified for the defense that he knew and interacted with the Wards when they lived in Grayson Apartments. He said that

he liked K.W. when he first met her but that once he got to know her, he thought she was an "attention getter." He said that she manipulated the Defendant, Ms. Ward, and her grandmother and that she did not respect Ms. Ward. He said that K.W. did not like him because he made her respect Ms. Ward when she was at his apartment and that she did not like the Defendant because he made her "do the right thing." He said K.W. would do anything "to get eyes on her." He said that she was a "good kid" when the Defendant had money to buy her things but that if he could not, she was "unruly." He said that when the Defendant was not around, K.W. "ran things." He said K.W. told him that if the Defendant would not have made her mad, she would not have told the officer what she told him. He said that he was testifying only because he was subpoenaed and that he did not want to get involved.

On cross-examination, Mr. Cleveland testified that he worked two jobs at the time of the incident but that he was around in the evenings and observed K.W.'s being disrespectful to her mother. He stated that because the Defendant was not around much at the time, Ms. Ward and K.W. came to his apartment frequently and that his wife and Ms. Ward had a close relationship. He said that he, Ms. Ward, and the Defendant were not necessarily friends but neighbors.

The jury found the Defendant guilty of aggravated kidnapping and domestic assault against Ms. Ward. It found him guilty of especially aggravated kidnapping of K.W. but not guilty of domestic assault of K.W. The trial court sentenced the Defendant to an effective seventeen years' confinement. This appeal followed.

# I

## Aggravated Kidnapping of Jody Ward

The Defendant contends that the evidence is insufficient to support his conviction for the aggravated kidnapping of Jody Ward. The State contends that the evidence is sufficient to support the convictions. In a related issue first raised by the State, it acknowledges that the trial court failed to instruct the jury in accord with State v. White, 362 S.W.3d 559 (Tenn. 2012), regarding the substantial interference element of kidnapping but that the error was harmless beyond a reasonable doubt. The Defendant responds that the error was not harmless beyond a reasonable doubt and that the evidence supports only a domestic assault conviction, not an aggravated kidnapping conviction. We conclude that although the evidence is sufficient to support the aggravated kidnapping conviction, the Defendant is entitled to a new trial at which the proper jury instructions are to be given.

-8-

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Relevant to this case, aggravated kidnapping "is false imprisonment . . . [w]here the victim suffers bodily injury." T.C.A. § 39-13-304(a)(4) (2010). "A person commits . . . false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a). Unlawful confinement, in relevant part, "is accomplished by force, threat or fraud[.]" Id. § 39-13-301(13).

In the light most favorable to the State, the evidence shows that the Defendant grabbed Ms. Ward around her neck, pushed her into a tent in K.W.'s room, and would not let her leave the apartment. In her interview with Officer Romer, Ms. Ward said that the Defendant would not let her leave through the front door and that she wanted K.W. to go out the window because they could not leave through the front door. She testified that the Defendant had the keys to the apartment to prevent her locking him outside, and K.W. testified that the Defendant had the apartment keys and the cell phone.

The jury's guilty verdict credited the testimony of K.W. and other State witnesses. Although Ms. Ward testified that she was able to leave and could have used her neighbor's telephone, the jury verdict credits her statements made in the police interview that she could not leave freely. The Defendant argues that the State failed to prove Ms. Ward's injury occurred as a result of the kidnapping. By its verdict, the jury concluded that Ms. Ward's injury occurred during the unlawful confinement. T.C.A. § 39-13-304(a)(4) (2010); see State v. Evangeline Combs and Joseph D. Combs, Nos. E2000-02801-CCA-R3-CD, E2000-02800-CCA-R3-CD, slip op. at 64 (Tenn. Crim. App. Sept. 25, 2002) ("A plain reading of the [especially aggravated kidnapping] statute indicates that a conviction for the kidnapping offense requires proof only that the victim's serious bodily injury occurred during the unlawful confinement.").

We note that the Defendant has not challenged the sufficiency of the evidence to support his domestic assault conviction. Domestic assault is an assault committed against defined categories of victims, including a spouse. T.C.A. §§ 39-13-101 (2006) (amended 2009, 2010); 39-13-111(a)(1), (b) (Supp. 2008) (amended 2009, 2010). Were there not a

separate domestic assault conviction, we would conclude that the evidence was sufficient to support the aggravated kidnapping conviction. Because there are convictions for a kidnapping offense and a related offense, though, we must consider as a question of plain error whether due process permits dual convictions for aggravated kidnapping and domestic assault.

Our supreme court has adopted the factors developed by this court to be considered

when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The record must establish all five factors before plain error will be recognized and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

The record clearly establishes what occurred in the trial court, and it does not reflect that the Defendant waived the issue for tactical reasons. Our analysis that follows is relevant to whether a clear and unequivocal rule of law was breached, whether a substantial right of the Defendant's was adversely affected, and whether consideration of the error is "necessary to do substantial justice."

After the Defendant's trial, our supreme court provided a new method for analyzing whether dual convictions of a kidnapping offense and another felony are permitted on due process principles. See State v. White, 362 S.W.3d 559 (Tenn. 2012) (overruling State v. Richardson, 251 S.W.3d 438 (Tenn. 2008); State v. Fuller, 172 S.W.3d 533 (Tenn. 2005); State v. Cozart, 54 S.W.3d 242 (Tenn. 2001); State v. Dixon, 957 S.W.2d 532 (Tenn. 1997); State v. Anthony, 817 S.W.2d 299 (Tenn. 1991)). Previously, an appellate court was required to conduct a due process inquiry in order to determine whether dual convictions were constitutionally permissible. See, e.g., Richardson, 251 S.W.3d 438. In White, the court said that a separate appellate due process analysis is not necessary. The court held that the inquiry "is a question for the jury after the appropriate instructions," with appellate review

of the sufficiency of the evidence serving as the due process protection.  White, 362 S.W.3d at 577-78; see State v. Cecil, 409 S.W.3d 599, 609 (Tenn. 2013) ("Only when the jury is properly instructed can appellate review of the sufficiency of the convicting evidence satisfy the due process safeguard.").

White held that a proper jury instruction must "define the key element–substantial interference with the victim's liberty–as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." White, 362 S.W.2d at 580.  To that end, White provided an interim jury instruction and invited the Tennessee Pattern Jury Instruction Committee to develop a pattern instruction for use in trials in which a defendant is indicted for kidnapping and an accompanying felony. See id. at 580-81.  Following White, the committee approved this instruction:

> To find the defendant guilty of [especially] [aggravated] [kidnapping] [false imprisonment], you must also find beyond a reasonable doubt that the removal or confinement was to a greater degree than that necessary to commit the offense(s) of _____ as charged [or included] in count(s) _____.  In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> (a) the nature and duration of the alleged victim's removal or confinement by the defendant;
>
> (b) whether the removal or confinement occurred during the commission of the separate offense;
>
> (c) whether the interference with the alleged victim's liberty was inherent in the nature of the separate offense;
>
> (d) whether the removal or confinement prevented the alleged victim from summoning assistance, although the defendant need not have succeeded in preventing the alleged victim from doing so;
>
> (e) whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and
>
> (f) whether the removal or confinement created a significant danger or increased the alleged victim's risk of harm independent of that posed by the separate offense.

Unless you find beyond a reasonable doubt that the alleged victim's removal or confinement exceeded that which was necessary to accomplish the alleged _____ and was not essentially incidental to it, you must find the defendant not guilty of [especially] [aggravated] [kidnapping] [false imprisonment].

Cecil, 409 S.W.3d at 607 (quoting 7 T.P.I.–Crim. 8.01-.03, 8.05 (footnote omitted) (citing White, 362 S.W.3d at 578-81)).

The jury instruction defining substantial interference with the victim's liberty, a material element of the offense of false imprisonment, was not given at the Defendant's trial. This was error. See id. at 609. In Cecil, the court said that the touchstone of determining whether the error was harmless beyond a reasonable doubt "is whether a rational trier of fact could interpret the proof at trial in different ways." Id. at 608 (quoting White, 362 S.W.3d at 579). Like the present case, Cecil involved a domestic assault in which there was proof that the defendant prevented the victim from leaving their home. Reviewing the evidence, the Cecil court concluded that the proof was capable of more than one interpretation regarding "whether there was a removal or confinement of the victim that was not essentially incidental to the assault." The court held, therefore, that the defendant was entitled to a new trial on the false imprisonment charge. Id. at 613.

Regarding the present case, we have noted the evidence from which a jury could find the elements of aggravated kidnapping. We note, as well, that the evidence would support an alternative conclusion that the Defendant assaulted Ms. Ward but did not substantially interfere with her liberty, an element of the false imprisonment necessary for a finding of guilt of aggravated kidnapping. Ms. Ward said in her pretrial statement that the Defendant would not let her leave the apartment. K.W. testified that the Defendant would not let her mother and her leave the apartment. Ms. Ward testified at the trial, however, that the Defendant grabbed her neck when they were in the bedroom but that he never told her to stay in the bedroom, that she could have left the apartment at any time, and that she could have used a neighbor's cell phone. Although she testified that the Defendant had her cell phone and keys, she said he had the keys to prevent her locking him outside the house as she had done previously.

We conclude that the proof was capable of more than one interpretation regarding "whether there was a removal or confinement of the victim that was not essentially incidental to the assault." Id. at 612. As Cecil emphasized, it is the duty of a properly instructed jury to assess whether the evidence establishes every element of kidnapping, "with the appellate courts assessing the sufficiency of the convicting evidence as the ultimate component of due

process protections." Id. at 607. Because the proof was capable of more than one interpretation, the error was not harmless beyond a reasonable doubt.

From this, we conclude that a clear and unequivocal rule of law was breached and that a substantial right of the Defendant's was adversely affected. Because we have concluded that the error was not harmless beyond a reasonable doubt, we also conclude that consideration of the error is necessary to do substantial justice. As a matter of plain error, the Defendant is entitled to a new trial on the aggravated kidnapping charge.

## II

### Aggravated Kidnapping of K.W.

The Defendant contends that the evidence is insufficient to support his conviction for especially aggravated kidnapping of K.W because he could not "unlawfully" confine K.W. without parental consent because he was her parent. He also argues that the indictment did not allege the alternative mode of the offense, confinement by force, threat, or fraud, and that because he was acquitted of the domestic assault of K.W., the State did not prove that the kidnapping of K.W. was by force, threat, or fraud. The State contends that the evidence is sufficient to support the Defendant's conviction and that the Defendant has waived any challenge to the indictment by failing to raise the issue before the trial. We conclude that a fatal variance existed between the indictment and the State's proof and that the conviction must be vacated.

Relevant to this case, especially aggravated kidnapping "is false imprisonment . . . [w]here the victim was under the age of thirteen (13) at the time of the removal or confinement." T.C.A. § 39-13-305(a)(2) (2010). As we have noted, "A person commits . . . false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a). Unlawful confinement "is accomplished by force, threat or fraud, or, in the case of a person who is under the age of thirteen (13) or incompetent, accomplished without the consent of a parent." Id. § 39-13-301(13).

Regarding the State's waiver argument, we acknowledge that an allegation of a defect in an indictment is one of the matters that is required to be raised in a pretrial motion pursuant to Tennessee Criminal Procedure Rule 12(b)(2)(B). If the issue is not raised before the trial, it is waived. Tenn. R. Crim. P. 12(f)(1). The Defendant's argument, though, is not that the indictment was defective. Rather, he argues that he was not charged with the mode of the offense of which he was convicted–especially aggravated kidnapping committed by unlawfully confining a victim by force, threat, or fraud. The issue is not waived, and we will address it below.

## A. <u>Kidnapping by a Parent</u>

The Defendant contends, first, that he cannot be prosecuted for especially aggravated kidnapping of his child. He argues that as her parent, he provided the consent for her confinement, meaning the confinement was not unlawful. In <u>State v. Goodman</u>, 90 S.W.3d 557 (Tenn. 2002), the supreme court considered a similar challenge. The <u>Goodman</u> defendant was charged with kidnapping his biological daughter. He and the child's mother were unmarried, and there were no judicial determinations of paternity, custody, visitation, or support. The court stated, "[A]s the minor child's father, the defendant is not subject to prosecution for especially aggravated kidnapping under Tennessee Code Annotated section 39-13-305(a)(2) in the absence of an allegation that the minor child was removed or confined by force, threat, or fraud." <u>Goodman</u>, 90 S.W.3d at 565. The court reasoned that the statutory language was plain: removal or confinement was not unlawful if one of the child's parents consented. As the biological father and in the absence of a court order limiting his access to the child, the <u>Goodman</u> defendant's consent to his own actions was sufficient. <u>Id.</u> at 564.

In the present case, the Defendant was K.W.'s father. To the extent that the proof may be construed to demonstrate that he confined her to the family's apartment, his confinement was not unlawful because as her parent, he consented to his own actions. We note the absence of any proof that he was subject to a court order restricting his parental rights. We agree with the Defendant that the proof is insufficient to support a conviction of especially aggravated kidnapping by a parent of a child under thirteen years of age.

## B. <u>Kidnapping for Force, Threat, or Fraud</u>

A question arises whether the Defendant, parental authority notwithstanding, could be convicted of kidnapping K.W. by force, threat, or fraud. <u>See</u> T.C.A. § 39-13-301(13). In other words, the question is whether the "force" he used to confine her in the apartment was within the conduct intended to be prohibited by the kidnapping statute.

Our courts have recognized a parent's fundamental right to the care, custody, and control of a child. <u>Stanley v. Illinois</u>, 405 U.S. 645 (1972); <u>Hawk v. Hawk</u>, 855 S.W.2d 573, 577 (Tenn. 1993). The right is not absolute and may be surrendered when the parent abandons the child or engages in acts that pose a threat of substantial harm to the child. <u>Nale v. Roberston</u>, 871 S.W.2d 674, 678 (Tenn. 1994). No Tennessee case directly addresses whether a parent may be prosecuted for kidnapping by use of force, regardless of the amount of force used. In the present case, the jury acquitted the Defendant of assaulting his daughter.

In other jurisdictions, while there is usually no express exemption for parents, the courts generally, with few exceptions, recognize that parents have a lawful right to control the liberty of their children and that such control cannot be 'unlawful' unless there is a legally effective court order limiting such rights.

State v. Porter, 241 S.W.3d 385, 393 (Mo. Ct. App. 2007) (citing State v. Huhn, 142 S.W.2d 1064, 1067 (Mo. 1940); Annotation, Kidnapping—Taking of Own Child, 20 A.L.R.4th 823, § 3 (1983); 51 C.J.S. Kidnapping §§ 11, 31 (2003); Anderson v. Cramlet, 789 F.2d 840, 844 (10th Cir. 1986); State v. LaCaze, 630 P.2d 436 (1981)). Some courts have permitted kidnapping prosecutions if the parent's actions place the child in harm's way or are for a separate unlawful purpose. See, e.g., People v. Checketts, 84 Cal. Rptr. 2d 491 (Cal. Ct. App. 1999) (stating that parents have the right to discipline their children reasonably, including "confinement to a particular location for disciplinary purposes" but that a parent who confines his or her child with the intent to endanger the child's health and safety or for an unlawful purpose is subject to prosecution for false imprisonment); Byrd v. United States, 705 A.2d 629, 634 (D.C. 1997) (concluding that the "parent exception to the . . . kidnapping statute is not a defense where the defendant has engaged in separate felonious conduct during the kidnapping which exposes the child to a serious risk of death or bodily injury"); People v. Walker, 473 N.E.2d 995, 997 (Ill. App. Ct. 1985) (affirming a parent's conviction because the restraint of the child was unreasonable and without lawful parental authority); State v. Siemer, 454 N.W.2d 857 (Iowa 1990) (concluding that although a parent may confine his or her child under reasonable circumstances, the parent may be prosecuted for kidnapping for removal or confinement to accomplish sexual abuse or subject the child to physical injury); State v. Teynor, 414 N.W.2d 76, 80 (Wis. Ct. App. 1987) (although the exercise of reasonable discipline by a parent may be used as a defense for a charge of a crime by a parent against a child, there is no absolute immunity from prosecution).

Were it necessary for us to resolve the question of the extent to which a defendant's status as a parent shields him from prosecution for kidnapping his child, we would have to consider whether the Defendant's conduct constituted force that was "unlawful" as contemplated by the false imprisonment and kidnapping statutes. We are not required to reach that question because a fatal variance exists between the mode of the offense charged and the State's proof at the trial.

## C. **Variance**

In Goodman, the indictment alleged that the defendant "did . . . unlawfully and knowingly remove and confine [the victim], a person under thirteen (13) years of age, so as

to interfere substantially with [the victim's] liberty, in violation of TCA 39-13-305." Id. at 562. The indictment in the present case alleged that the Defendant:

> . . . did knowingly and unlawfully remove or confine [K.W.], so as to interfere substantially with the liberty of [K.W.], and [K.W.] was less than thirteen years of age at the time of the removal or confinement, in violation of Tennessee Code Annotated §39-13-305, and against the peace and dignity of the State of Tennessee.

Thus, like the indictment in Goodman, the Defendant's indictment does not specifically allege that the mode of the offense was through force, threat, or fraud. Despite the indictment's limiting the State to proving that the Defendant committed the offense without the consent of a parent, the record reflects that the jury was instructed that the "unlawful confinement" element of especially aggravated kidnapping could be shown either by establishing that the confinement was (1) of a person under age thirteen and without the consent of a parent, custodian, or other person responsible for the child or (2) through force, threat, or fraud.

A variance between the information in the indictment and the evidence presented at the trial is fatal in Tennessee only if the variance is "material" and "prejudicial" to the defendant. State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984). "Material" means that an essential element of the charge is lacking, such that the allegations and proof do not correspond substantially. See id. "Prejudicial" means a substantial right has been affected: either the defendant was misled at the trial and could not prepare a defense or is exposed to a risk of double jeopardy. Id. As our supreme court stated, a variance is not material or prejudicial when "the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." Id. Where, however, an indictment charges one mode of an offense but the proof demonstrates a different mode, the variance is considered a constructive amendment of the indictment, and reversal is automatic. See, e.g., State v. Goodson, 77 S.W.3d 240, 244-45 (Tenn. Crim. App. 2001).

Because the Defendant was not charged with especially aggravated kidnapping of K.W. through force, threat, or coercion, his conviction cannot rest on that basis. Because we have likewise eliminated the possibility that his conviction for especially aggravated kidnapping may stand on the basis of lack of parental consent, the conviction is vacated, and the charge is dismissed.

We also note that had we not vacated the Defendant's especially aggravated kidnapping conviction on these grounds, it would have been necessary for us to consider whether the absence of the <u>White</u> instruction was harmful error. Because of our disposition, though, the issue need not be analyzed.

In consideration of the foregoing and the record as a whole, the Defendant's conviction for especially aggravated kidnapping is vacated, and the charge is dismissed. The conviction for aggravated kidnapping is reversed, and the case is remanded for a new trial at which the jury shall be instructed in accord with <u>White</u> and <u>Cecil</u>. The domestic assault conviction is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE